#24506-a-DG

**2008 SD 38**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

In the Matter of the Estate of
MARY LOUISE PRINGLE,
Deceased.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE A.P. FULLER
Judge

\* \* \* \*

ERIC J. PICKAR
GREGORY J. ERLANDSON
ALLEN G. NELSON of
Bangs, McCullen, Butler,
  Foye and Simmons, L.L.P.
Rapid City, South Dakota              Attorneys for appellants
interested person Judith
Maxwell & Thomas Pringle.


BRIAN L. UTZMAN of
Smoot & Utzman, P.C.
Rapid City, South Dakota              Attorneys for appellee
Ronald H. Pringle.

\* \* \* \*

ARGUED JANUARY 9, 2008

OPINION FILED **05/28/08**

#24506

GILBERTSON, Chief Justice

[¶1.] On February 20-22 and 27, 2007, a trial was held in the South Dakota Seventh Judicial Circuit to decide the validity of land conveyances executed by Mary Louise Pringle (Mary) prior to her death and whether to admit for probate her last will and testament dated September 26, 2000. On March 27, 2007, the circuit court entered findings of fact and conclusions of law and on April 2, 2007, it entered its judgment and order validating the land conveyances and admitting the will to probate. Mary's children, Judith Maxwell (Judy) and Thomas Pringle Jr. (Tom), appeal. We affirm.

## FACTS AND PROCEDURE

[¶2.] Mary and Thomas Pringle, Sr. (Tom, Sr.) were married in 1946. The couple raised four children, Judy, Ronald (Ron), Tom and Charles (Chuck). Mary and Tom, Sr. farmed in the Bridgewater, South Dakota area and later operated a laundry in Pierre, South Dakota for many years.

[¶3.] The farming operation consisted of the Pringle homestead quarter section[1] and three additional quarters totaling 640 acres located in McCook County, South Dakota near Bridgewater. In the late 1960s Mary and Tom, Sr. turned the day-to-day farming operations over to Chuck. Chuck managed the farm until 1987. At that time Ron, who lived in Bridgewater, took over the farming operations.

[¶4.] Mary and Tom, Sr. eventually retired to a home in Hill City, South Dakota. The couple neighbored in Hill City with Joel and Gloria Pine. Joel was

---

1. Tom, Sr.'s grandfather homesteaded the "Pringle quarter."

-1-

retired from the South Dakota Highway Patrol. He had worked in Pierre over the years and had known Mary and Tom, Sr. from their laundry business.

[¶5.] On February 25, 1988, Mary and Tom, Sr. executed wills. The wills provided that each spouse was primary beneficiary of the other's estate, but that if either spouse predeceased the other, all of the surviving spouse's real and personal property would be equally devised to Judy, Ron and Tom.[2] Mary and Tom, Sr. held their real property in joint tenancy.

[¶6.] On March 18, 1998, Mary signed a power of attorney form "for healthcare purposes only" that was provided by the Rapid City Regional Hospital. Judy was designated as Mary's health care agent. Tom was named first alternate and Ron was named second alternate. Joel and Gloria Pine served as witness to Mary's signature on the document.

[¶7.] On April 13, 1998, Tom, Sr. died. At the trial, Gloria Pine testified that the death of Tom, Sr. marked the point at which Mary's physical and mental health, as well as her personal hygiene began to gradually deteriorate. There is no dispute that following the death of Tom, Sr., Ron made frequent trips to Hill City to visit his mother. Several people from the Hill City area who had known Mary, including Pennington County Sheriff's Deputy, Jeromey Smith (Deputy Smith), who had been dispatched to her home repeatedly to check on her well being, and Mary's friends and neighbors the Pines, offered testimony that Mary trusted Ron very much and came to rely on him to a great extent. The two exchanged daily telephone

---

2. Mary and Tom, Sr. essentially disinherited Chuck over a dispute about his management of the farm.

calls to the point that Ron would call his mother before leaving home so that she would know that she would not be able to reach him for a time.

[¶8.]    In August 2000, Mary contacted her long-time attorney Michael Unke (Unke), a Bridgewater native practicing in Salem, South Dakota, about drawing up a durable power of attorney and living will (POA). Mary and Tom, Sr. had had a relationship with Unke that dated back to about 1988 when the couple had retained him to draft some farm leases. Unke thereafter had regular contact with Mary and Tom, Sr. Unke testified that Mary had seen a news article about POAs and had sent it to him and that she sought his opinion as to whether she should have one. Unke stated that during their discussion, Mary told him that she wanted Ron to make medical decisions and handle her affairs if she became unable to do so because she trusted him. Unke drafted the document and sent it to Mary in Hill City on or around August 18, 2000. The Pines and Neil Holzwarth (Holzwarth), vice president of First Western Bank in Hill City, testified that Mary subsequently contacted them and asked them to come to her home for the signing. On August 23, 2000, Holzwarth notarized the document while the Pines witnessed her signature. Ron was not present.

[¶9.]    Earlier in August 2000, Ron and Tom stayed at Mary's house in Hill City while attending the Black Hills Motorcycle Rally. While there, Tom drained the sewage from his motor home into the septic tank at his mother's house. According to Ron, he helped Tom remove the cap from the clean-out so that Tom could run his sewer line into the tank. Ron then left, but told Tom to make sure that he replaced the cap when finished.

[¶10.]     On September 9, 2000, Tom, who lived in Chamberlain, South Dakota, received a phone call from Mary, berating him for not properly replacing the cap to the clean-out, which Tom denied. Tom testified that at the conclusion of this call, Mary told him, "This was your mother. You'll never hear from me again." Disturbed by the call, Tom contacted Ron to inquire if he knew anything about the cap and why Mary would have become so agitated. According to Tom, Ron told him that he had been out policing the property after the Rally and found the cap askew, straightened it, and also informed Mary. Ron testified that when his mother asked if Tom was responsible he replied that he did not think so, but rather neighborhood kids, whom Mary had seen running about the yard recently, could have been responsible. Tom testified that he did not ever recall asking Ron to help straighten out the disagreement with his mother. Tom did not speak to his mother again until 2004.

[¶11.]     Later on September 9, 2000, Tom contacted Judy to inform her about the call he had received from Mary. Judy, who lived in Pierre, became very upset with Mary based on Tom's account of the call. That same day, Judy called her mother. According to her testimony, Judy did all of the talking and "didn't give [Mary] a chance to say anything." The telephone call ended when Judy hung up on her mother.[3] Following the September 9 call, Judy had no contact with her mother until 2005.

---

3.     Judy testified that the last time prior to the September 9 call that she talked to Mary had been during a telephone call on the Saturday after July 4, 2000. Judy characterized that call as "very cold" and considered it the point at which her relationship with her mother took a "turn for the worse."

[¶12.] In mid September 2000, Mary again contacted Unke. According to Unke, Mary discussed with him her desire to have the McCook County farm pass to Ron outside her will. Unke testified during a deposition and at trial that "it was very important to her" that the farm remained intact and in the Pringle name. He stated that in the past he had conversations with Mary where she indicated to him that "she was very close to Ron; that he had been handling the farm; and that she wanted to keep the farm in the family" and that Ron would do so. Conversely, Mary stated that Judy and Tom, who were not interested in farming "would just sell it to get the money."

[¶13.] At Mary's request, Unke drafted a deed conveying the McCook County farm to her and Ron in joint tenancy with right of survivorship. Unke also drafted a new will that expressly set out Mary's intent to have joint tenancy property pass outside the will with the remainder of her estate to be divided equally among Judy, Ron and Tom. Unke sent the documents to Mary under separate covers of transmittal with instructions for proper execution.[4] Mary again contacted the Pines and Holzwarth to assist with execution of the documents. On September 19, 2000, Holzwarth came to Mary's house in Hill City to notarize her signature on the deed. On September 26, Holzwarth returned to Mary's house to notarize her signature on the new will and there again met the Pines who acted as witnesses. Ron was not present at the signing of either document.

---

4. When questioned at trial whether he had carbon copied anyone else on the deed or the will, Unke replied that he had not because, "I wasn't asked to."

[¶14.] In 2002, Mary once again contacted Unke and requested that he draft another deed, this time to convey her home in Hill City to herself, Ron and his son Ronnie in joint tenancy. Unke drew up the deed and on September 20, 2002, sent it to her under cover of transmittal with instructions for proper execution. Again, Mary contacted Holzwarth and asked him to come to her house to notarize her signature on the deed. Mary signed the deed on September 27, 2002. On April 4, 2003, Mary signed a third deed transferring three lots in the City of Bridgewater to Ron for "$500.00 and other good and valuable consideration."

[¶15.] Mary's physical and mental deterioration accelerated during the latter part of 2003 into 2004 and in 2005, she was moved to a nursing home at the Beverly Healthcare facility in Rapid City. Mary died on August 4, 2005. Under the provisions of the September 26, 2000 will, Mary had nominated and appointed Ron as personal representative for the estate. On September 19, 2005, Ron filed a petition with the circuit court for formal probate of the will and acceptance of appointment. The February 20-22 and 27, 2007 trial followed Judy's and Tom's objection to the will and appointment of Ron.

[¶16.] Judy and Tom argued at trial that due to her failing mental and physical condition following the death of Tom, Sr. in 1998, Mary was incompetent and lacked testamentary capacity at the time she signed the September 26, 2000 will and that the will was the product of Ron's undue influence upon her such that it was not valid. Moreover, they asserted that Ron took advantage of his confidential relationship with Mary and her failing condition in order to fracture their relationship with her so that he could gain title to the McCook County farm, the Hill City home and the Bridgewater lots. However, when Judy was asked at

trial what actions Ron took to exert undue influence on her mother to their detriment, Judy responded that she had no specifics. She was also asked if she had seen any documents where Ron had indicated to his mother that he was "entitled to everything." Again, Judy replied that she had seen none. Tom likewise could point to no statements or actions by Ron that influenced Mary to convey the property and execute a new will. In addition, Deputy Smith testified that while Ron was the only family that frequently visited Mary, he could recount no instance of him influencing Mary to do anything. Still, Judy stated the supposed actions of Ron were "*the only explanation I can find in my mind* why she [Mary] stopped talking to me and Tom [in the September 2000 time frame] and did all these severe changes in her life." Specifically, with respect to Tom's relationship with Mary, Judy went on to state, she *believed* that Ron "*could have done something*" to repair the relationship, but did not. However, when Tom was asked whether he had asked Ron to intercede on his behalf, Tom stated, "I don't believe I asked him . . . . I don't specifically remember asking him to attempt to repair my relationship with my mom. I can't recall that." Though when asked for a reason why his mother disowned him on September 9, 2000, Tom replied, "*I believe* that Ron influenced her. *I think*, he – *that's what I believe in my heart*." Tom went on to testify, "*I believe* Ron wanted the farmland in the worst way, and he would do whatever it took to acquire that farmland and any other property that mom owned free and clear without paying a dime for it."

[¶17.] The circuit court found that Mary was legally competent when she signed the will and deeds and that the documents were not the result of undue

influence. The court also found, however, that Mary became incompetent on or about July 1, 2003. Having initially ordered the appointment of Ron as personal representative on December 16, 2005, the circuit court, following the trial, ordered that Ron be removed from that capacity in favor of a court-appointed special administrator tasked with determining whether any gifts or other transactions made by Mary after July 1, 2003 should be invalidated.

[¶18.]    Judy and Tom raise two issues on appeal:

1.    Whether the circuit court erred in refusing to invalidate the will and real property deeds based on Mary's alleged incompetence and lack of testamentary capacity or on Ron's alleged undue influence.[5]

2.    Whether Ron breached a fiduciary duty.

### STANDARD OF REVIEW

We review a trial court's findings as to testamentary capacity under the clearly erroneous standard. Likewise, the issue of whether undue influence exists is a question of fact for the trial court to determine. . . . We will not set aside a trial court's findings of fact unless they are clearly erroneous. A trial court's finding is clearly erroneous if, after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been made[.] All conflicts in the evidence must be resolved in favor of the trial court's determinations. The credibility of the witnesses, the weight to be accorded their testimony, and the weight of the evidence must be determined by the [circuit] court and we give due regard to the [circuit] court's opportunity to observe the witnesses and the evidence. We review any documentary or deposition evidence under a de novo standard of review.

---

5.    While Judy and Tom couch this issue in terms of error with respect only to the deeds and an assertion of undue influence, their argument on appeal clearly encompasses an objection to the will and assertions that Mary was incompetent and lacked testamentary capacity at the time these documents were executed.

*In re* Estate of Dokken, 2000 SD 9, ¶10, 604 NW2d 487, 490-91 (internal citations and quotation marks omitted). "On review the successful party is entitled to the benefit of his version of the evidence and of all favorable inferences fairly deducible therefrom." Matter of Podgursky's Estate, 271 NW2d 52, 56 (SD 1978) (quoting *In re* Estate of Hobelsberger, 85 SD 282, 181 NW2d 455, 458 (1970) (citing *In re* Blake's Estate, 81 SD 391, 136 NW2d 242 (1965))).

## ANALYSIS AND DECISION

[¶19.]    **1.    Whether the circuit court erred in refusing to invalidate the will and real property deeds based on Mary's alleged incompetence and lack of testamentary capacity or on Ron's alleged undue influence.**

*Competency*

[¶20.]    Our statute, setting out the basic requirements to make a will mandates that the testator be of sound mind. SDCL 29A-2-501. Testamentary capacity and competence evincing the soundness of mind required to make a will are demonstrated when without prompting, one is able to comprehend the nature and extent of his property, the persons who are the natural objects of his bounty and the disposition that he desires to make of said property. Matter of Estate of Linnell, 388 NW2d 881, 883 (SD 1986) (quoting *Podgursky*, 271 NW2d at 55). Testamentary capacity and competence in this regard does not require that one have the intellectual vigor of youth or perfect health. *Id*. (quoting Petterson v. Imbsen, 46 SD 540, 194 NW 842, 844 (1923)). Mere physical weakness is not determinative of soundness of mind. *Id*. (citing *In re* Estate of Anders, 88 SD 631, 226 NW2d 170, 173 (1975)). Moreover, it is not necessary that a person desiring to

make a will have the capacity to make contracts and do business. *Id.* (quoting *Petterson*, 46 SD 540, 194 NW at 844). One may lack competency, such that in the view of medical science he is not of sound mind and memory, yet still retain the requisite competency to execute a will. *Dokken*, 2000 SD 9, ¶14, 604 NW2d at 491 ¶14 (citing *Podgursky*, 271 NW2d at 57 (citing Keely v. Moore, 196 US 38, 25 SCt 169, 49 LE2d 376 (1904))). "Testamentary capacity is not determined by any single moment in time, but must be considered as to the condition of the testator's mind a reasonable length of time before and after the will is executed." *Id.* ¶14 (quoting Matter of Estate of Long, 1998 SD 15, ¶23, 575 NW2d 254, 258 (citing *In re* Guardianship and Conservatorship of Lanning, 1997 SD 81, ¶11, 565 NW2d 794, 796 (citing *In re* Estate of Nelson, 330 NW2d 151, 155 (SD 1983)))).

[¶21.]       In this case, during 2004 there was substantial testimonial and documentary evidence that Mary suffered a steady decline in her mental and physical faculties. Deputy Smith had been dispatched repeatedly to Hill City to check on Mary after her reports that people were in her basement or drilling beneath her basement. At other times, she had reported that a man and woman were coming into her house through a vent behind her television set. On at least one occasion Mary reported that someone was having a baby under her deck. On still another occasion, when Ron was staying with his mother, Mary called the sheriff's department to report that he was in the basement doing drugs. However, when Deputy Smith arrived at Mary's, he found no sign of any drugs and that Ron was merely in the basement sleeping. Other than a call on April 17, 2003, in which Mary with no apparent justification alleged that a long-time friend and home nurse

had stolen what Mary believed to have been a $350,000.00 sweepstakes ticket, all of Mary's seemingly delusional reports to law enforcement occurred in 2004. In the opinion of Deputy Smith, by late 2004, Mary was "getting to the point" where she should not have been living alone.

[¶22.] The Pines also testified to Mary's deteriorating mental faculties. Gloria indicated that while the pace of the deterioration was gradual following the death of Tom, Sr., it progressed more significantly following a fire in the Black Hills in August 2002 that forced Mary to evacuate her home. Joel testified that he had also come to Mary's in response to her reports of strange people in her basement. However, he indicated that these episodes did not begin until 2004. In general, Joel stated that in the year prior to Mary's death in August 2005, her mental condition had become terrible.

[¶23.] An assistant vice president at First Western Bank, Bruce Pelton (Pelton), described Mary as being of questionable lucidity. He also stated that she would call the bank to ask employees to deliver things like groceries. However, he did not start working at the bank until February 2004. Based on conversations with bank employees that predated his tenure, he believed that Mary had been behaving in this way for "several months" prior to the date that he started work at First Western.

[¶24.] While these accounts support the contention of Judy and Tom that their mother was mentally incompetent, other evidence was supportive of the circuit court's determination that Mary was legally competent at the time she signed the deeds and her last will. For this analysis we treat the deeds as

testamentary in nature since the record indicates that Mary executed them with a mind toward disposition of the real property following her death.

[¶25.] On September 14, 2000, just prior to the September 19, 2000 farm deed and the September 26, 2000 will, Unke conducted a telephone call with Mary for the purpose of determining to his satisfaction that she was competent to change title to the farm ground in a way that would determine disposition upon death and to sign a new will. Unke recorded the call and a transcript was made.[6] The circuit court made a specific finding in regard to the recording of this conversation:

> . . . This taped phone conversation demonstrates that [Mary] was oriented to time and place when the conversation occurred. *She spoke in a clear voice which was completely comprehensible.* **It was not the voice of an old, frail or decrepit woman**.

(Emphasis added).

[¶26.] We conclude that the circuit court's assessment of Mary during the conversation is accurate. Unke asked Mary about the farm ground, other real estate and bank accounts. Mary stated that the farm ground consisted of four quarters. She went on to describe how the quarters were located in relation to each other and mentioned the names of townships in which the quarters were situated. She also identified the Hill City and Bridgewater City properties including addresses and legal descriptions. When asked about securities and bank accounts, Mary stated that she owned no stocks or bonds, but that she had certificates of deposit at First National Bank in Freeman, South Dakota and that she received her

---

6. In addition to the transcript, the tape from which it was made was included in the appellate record for our review.

social security at First Western Bank in Hill City. When asked about her children, Mary identified all four by name and gave birthdates and some details of birth. She also identified a son Michael, who died in childbirth, and stated the date and specifics about his death.

[¶27.] During his discussion with Mary about the disposition of her estate and how creating a joint tenancy for the farm ground would cause that property to pass directly to Ron upon her death, the following exchange transpired:

> Unke: OK. Uh . . . do you understand that upon your death Ron becomes owner of the property?
>
> Mary: Alright. That's fine.
>
> Unke: Is that what you want?
>
> Mary: Yes.
>
> Unke: OK . . . and I know your will treats the three children equally, why do you want to give Ron the farm?
>
> Mary: *Because he is the only one that wants to farm and all they want is the money out of it . . . the other ones . . .* that's totally.
>
> Unke: OK. You understand on your death that Ron will be the sole owner of that property?
>
> Mary: That's correct.
>
> Unke: And is that the way you want it?
>
> Mary: *That's the way I have to have it and that's the way I want it. Yes sir.*

[¶28.] Besides Mary's own references to her property, persons interested therein and the disposition thereof, as recorded by Unke, the testimony of others at trial further substantiated Mary's soundness of mind with respect to her property

throughout the time relevant to the new will and the deeds. Gloria Pine testified that during the time frame that the new will and farm deed were executed, Mary talked regularly about the McCook County farm ground and the Bridgewater City property. She further indicated that Mary knew how much farm ground she owned, and that she was sure that Mary was cognizant of all of her children. Judy also testified that in that time frame Mary was oriented to time and place knew of the property that she owned.

[¶29.] Holzwarth testified that he handled Mary's business at First Western Bank until turning it over to Pelton in February 2004. Holzwarth indicated that during the period in which he handled her accounts, Mary would call "semi-frequently" to make sure that she was getting competitive rates on her certificates of deposit. He also stated that "she was pretty diligent" and that "she had a pretty good handle or [knew] pretty close to the exact balances in the account[s] at the bank and how many CDs she had." Moreover, he indicated that she knew where her farm ground was, who was farming it and that she was cognizant of her farm income.

[¶30.] While there was evidentiary support to conclude that Mary's mental faculties had declined significantly by 2004, Joel Pine's testimony indicated that Mary "kept a pretty good handle on her property" through even mid 2004. In addition to real property, Mary also owned significant items of personal property, in particular an F-150 Ford pickup and a motor home. Joel stated that the F-150 was her "pride and joy" and that she always made sure that it was garaged. Gloria Pine testified that Mary would mention when she had bought batteries for her motor home and that she wanted to keep it in good shape. Tom testified that when he was

on speaking terms with his mother he had suggested that she sell the motor home since Tom, Sr. was no longer living and that she would no longer be using it. Tom stated that in response,

> She became instantly agitated. That was something that she had worked very hard on to acquire and that was something she would own to the day she died. *Nothing that she ever owned was going to be sold or done anything with. She was going to own it.*

[¶31.] That Mary was competent and of sound mind during the time at issue could also be reasonably inferred from documentary and testimonial evidence pertaining to the signing ceremonies for the various documents. Her cognizance of the requirements for executing a will is evident from rough notes in her own handwriting entered on August 21, 2000 in a notebook that was received into the record as Exhibit 54. The following entry was made:

> (my Will) start to my final will. I have to have 2 people sign (my) Witnessing of my person to help me and a notary public person to be there when I sign the papers for my Helping Hand namely Ronald Henry Pringle. *All is completed and I am so glad to have (Some) of the finalizing of the business.*

(Parentheses original, emphasis added).

[¶32.] On the same day she also made the following entry: "The (Notary Public) whom will witness my Signatures will be (Neil Holzwarth) at the First Western Bank – Hill City So. Dak and 2 (fine) witnesses, our Joel and Gloria Pine." (Parentheses original). The following entry was the last made on August 21, 2000:

> I need a Notary Public person Neil Holzwarth from HC Bnk and 2 witnesses to verify My Signature and date. Legal Info on Business <u>as Needed</u>. I read (all) My Info. and *let the chips fall where they may.* It seems =

(First emphasis original, parenthesis original, second emphasis added).

[¶33.]     Holzwarth testified that when Mary wanted him to notarize a document, she would call and make an appointment with him to come to her house. The Pines also testified that Mary made arrangements with them in advance to witness the POA and her last will. Both Holzwarth and the Pines indicated that Mary would have the documents ready for signing and pens and pencils available when they arrived for a signing ceremony. Holzwarth stated that Mary never wanted to take up any more of his time than necessary. Holzwarth testified that Mary would announce that he was there to notarize a deed or that he and the Pines, respectively, were there to notarize and witness her *last will and testament.*[7] Moreover, he had no question that she knew what the will and the deeds were for.

[¶34.]     Holzwarth indicated that at the times he notarized documents for Mary, she was oriented to time and place and was cognizant of the seasons. He also indicated that there was nothing in her behavior or speech that would have caused him to question her competency. Likewise, Joel Pine indicated that he and Gloria were not aware of any problems with Mary in or around the time of the signing ceremonies. Holzwarth had no question that Mary was competent to sign the documents stating:

> In my capacity as vice-president/loan officer and branch officer, I have a fair amount of contact with people. All of her thought processes and actions appeared to be in a capacity *that I had no reason to doubt her capacity of signing* [*these documents*].

---

7.     Holzwarth testified that Mary used the precise words "last will and testament" when announcing that document.

(Emphasis added).

[¶35.]     Finally, we contrast the facts of this case with those Judy and Tom cite in support of their position – *Dokken* and *Podgursky*. In the prior cases, the testators had been deemed incompetent for Department of Veteran's Affairs (VA) purposes, meaning they lacked the ability to handle their own affairs, including their VA disbursements. *Dokken*, 2000 SD 9, ¶21, 604 NW2d at 493; *Podgursky*, 271 NW2d at 55. The testators had been institutionalized or had lived in a supervised care environment for years. *Dokken*, 2000 SD 9, ¶4, 604 NW2d at 489; *Podgursky*, 271 NW2d at 53-54. Despite these facts, this Court affirmed the decisions below that the testators possessed testamentary capacity. *Dokken*, 2000 SD 9, ¶25, 604 NW2d at 494; *Podgursky*, 271 NW2d at 58.

[¶36.]     Although under the POA, Ron had the authority to administer Mary's affairs, evidence at trial suggested that Mary for the most part handled her own affairs into 2004. Holzwarth testified that Mary regularly checked on rates being paid on certificates of deposit, made her own arrangements to roll-over maturing certificates into new ones and checked to see if promotional rates were available at those times. Pelton testified that she had check writing ability on her account during 2004. In addition, Mary lived in her own home until 2005.

[¶37.]     While there is no way to know with certainty when Mary became incompetent, the record indicates that at some point she in fact did. However, our review of the record reveals that there is evidentiary support for finding that Mary was of sound mind for purposes of testamentary capacity throughout the time during which she signed her last will and the deeds. Therefore, we conclude that

the circuit court was not clearly erroneous in finding that Mary was legally competent at the time she signed her last will and the deeds and did not become incompetent until on or about July 1, 2003.

*Undue Influence*

a.      *The proponent's burden of going forward with the evidence when a confidential relationship exists.*

[¶38.]      Supported by the fact that Ron was Mary's attorney-in-fact by virtue of the August 23, 2000 POA, the circuit court found that Ron had a confidential relationship with his mother. The court thereby concluded that a presumption existed that Ron exerted undue influence on Mary when she signed her last will and the deeds, which resulted in her real property passing to him to the exclusion of Judy and Tom. The court found that Ron overcame the presumption and that Judy and Tom thereafter failed to prove Ron exerted undue influence.

[¶39.]      Judy and Tom argue that because Ron had a confidential relationship with Mary, the ultimate burden of proof in regard to undue influence *was for Ron to show that it did not occur.* Judy and Tom contend that the circuit court erred by *shifting* the burden to them *to show that undue influence occurred* after finding that Ron met the presumption. In the alternative, they argue that they met the burden. We disagree in both respects.

> A presumption of undue influence arises "when there is a confidential relationship between the testator and a beneficiary who actively participates in preparation and execution of the will and unduly profits therefrom."[8] *When this presumption arises, the burden shifts to the*

---

8.      While there is no evidence that Ron *participated in the preparation and execution* of the document, we decide this case on other grounds.

> *beneficiary to show he took no unfair advantage of the decedent.* **However, the ultimate burden remains on the contestant to prove the elements of undue influence by a preponderance of the evidence.**

*Dokken*, 2000 SD 9, ¶28, 604 NW2d at 495 (internal citations omitted) (emphasis added).

[¶40.]    We refer to the presumption that arises in a beneficiary holding a confidential relationship with the testator as *the burden of going forward with the evidence.* *Dokken*, 2000 SD 9, ¶28, 604 NW2d at 495-96; Matter of Estate of Unke, 1998 SD 94, ¶13, 583 NW2d 145, 148 (citing *In re* Estate of Metz, 78 SD 212, 100 NW2d 393, 398 (1960)); *Podgursky*, 271 NW2d at 58 (quoting *Anders*, 88 SD 631, 226 NW2d at 174); Davies v. Toms, 75 SD 273, 63 NW2d 406, 410 (1954) (observing that "[w]hile . . . *the 'burden of proof' never shifts from the one who undertakes to set aside **a deed** on the ground of undue influence*," there is a burden known as "the 'burden of going forward with the evidence'" "that does transfer over to the other side when evidence offered shows a relationship of trust and confidence") (citations omitted) (emphasis added); McKiver v. Theo. Hamm Brewing Co., 67 SD 613, 297 NW 445, 447 (1941). In *Podgursky*, we reiterated that it is a mistake to conclude that this burden equates with the ultimate burden of proof on the issue of undue influence. 271 NW2d at 59 (quoting *Anders*, 88 SD 631, 226 NW2d at 174). Rather, the presumption known as "the burden of going forward with the evidence" means only "the burden of going forward with a reasonable explanation of the (claimed) unnatural character of the [document]." *Id.* (quoting *Anders*, 88 SD 631, 226 NW2d at 174) (parenthesis original). In *McKiver*, this Court addressed the distinction between burden of proof and presumption:

> [A] presumption . . . disappears when evidence is introduced
> from which facts may be found.  As stated by this [C]ourt
> in the case of Peters v. Lohr, 24 SD 605, 124 NW 853, 855 (1910):
>
>> "A presumption is not evidence of anything, and
>> only relates to a rule of law as to which party shall
>> first go forward and produce evidence sustaining
>> a matter in issue.  A presumption will serve as and
>> in the place of evidence in favor of one party or the
>> other until prima facie evidence has been adduced
>> by the opposite party; but the presumption should
>> never be placed in the scale to be weighed as evidence.
>> The presumption, when the opposite party has
>> produced prima facie evidence, has spent its force
>> and served its purpose, and the party then, in whose
>> favor the presumption operated, must meet his
>> opponent's prima facie evidence with evidence, and
>> not presumptions."
>
> This burden of going forward with the evidence differs from
> the burden of proof.  A presumption casts upon the person
> against whom it is applied the duty to go forward with
> the evidence on the point to which the presumption relates.
> The burden of proof, meaning the duty of establishing the
> truth of a claim by such quantum of proof as the law
> requires, rests upon the party having the affirmative
> of an issue.  The latter never shifts during the course
> of a trial, while the burden of going forward with the
> evidence may shift.

67 SD 613, 297 NW at 447.

[¶41.]     To rebut the presumption that he was using his confidential relationship with Mary to further his own interest to the detriment of Judy and Tom, Ron contends that the numerous phone calls with and visits to his mother were not designed to exert undue influence on her, but rather were expressions of love and caring for his mother.  It is undisputed that after September 2000, neither Judy nor Tom had or attempted any communication with their mother for over four years.  Although they offered no evidence to the circuit court that Ron took any action to keep them from contacting their mother, they now claim that some vague

on-going effort by Ron to do just that was responsible for the fact that neither of them had any contact with her in person, by phone or by letter until 2004. This claim rings hollow in view of the fact that Ron, who lived in Bridgewater over 300 miles from Hill City, lived further away from his mother than either Judy (Pierre) or Tom (Chamberlain) and had no way to intercept phone calls or the mails.

[¶42.] There is also evidence in the record that it was very important to Mary that the McCook County farm ground remain in the Pringle family rather than being sold off for money. Again from the record, it is apparent that Mary was abundantly aware of the fact that Ron was farming the ground and that he would not sell it because he wanted to continue farming. Likewise, it is apparent that Mary intended for the Hill City home to serve as a memorial to Tom, Sr. and eventually her. A head stone was placed on the property. It is reasonable to infer that Mary believed that Ron would also retain that property so as to honor her wishes.

[¶43.] Moreover, Ron rebuts the presumption of undue influence by asserting that in Unke, Mary had independent advice when contemplating her last will and the deeds. *See* Black v. Gardner, 320 NW2d 153, 159 (SD 1982) (reiterating that the presumption of undue influence can be rebutted "by showing that the one allegedly overpersuaded had independent advice that was neither incompetent nor perfunctory") (citing *Davies*, 75 SD 273, 63 NW2d 406). Judy and Tom dismiss this assertion citing that Ron had retained Unke to represent him in 1998 during his divorce; in 1999 during a dispute with Chuck over the placement of Tom, Sr.'s remains in the Bridgewater Cemetery; in 2002 when he sought a protection order

against his ex-wife; and in 2005 for property issues. Notwithstanding the fact that the 2005 representation occurred after all of the documents in question were drafted and executed, this argument fails because these were entirely separate representations. What is determinative is the testimony of Unke in regard to his representation of Mary. Unke indicated that in regard to his consultation with his long-time client about her last will and the deeds, Mary is the one that he considered to be his client and he consequently considered that his ethical duties ran to her. Thus, we conclude that there was evidentiary support for the circuit court's finding that Ron rebutted the presumption that he used his confidential relationship with Mary to exert undue influence upon her. Therefore, we conclude that there is no basis upon which to determine that this finding was clearly erroneous.

b.     *The contestants' burden of proving the elements of undue influence.*

[¶44.]     Having established that Ron rebutted the presumption of undue influence, it then remains for Judy and Tom to prove that it occurred.

> It is well settled that it is [the burden of the contestant of a testamentary document] to prove each of the four elements of undue influence by the greater weight of the evidence. These elements include:
>
> (1)  decedent's susceptibility to undue influence;
> (2)  opportunity to exert such influence and effect the wrongful purpose;
> (3)  a disposition to do so for an improper purpose; and
> (4)  a result clearly showing the effects of undue influence.

*In re* Estate of Schnell, 2004 SD 80, ¶21, 683 NW2d 415, 421 (citing *In re* Estate of Holan, 2001 SD 6, ¶16, 621 NW2d 588, 591-92). "For influence to be undue it must be of such a character as to destroy the free agency of the testat[or] and substitute

the will of another for that of the testat[or]." *Id.* (alteration original) (quoting Matter of Estate of Elliott, 537 NW2d 660, 662 (SD 1995)).

[¶45.] The circuit court found that Mary was "not at all susceptible to undue influence." Mary was known to have been a frequent player of sweepstakes. An occasion occurred in which Mary contacted the Pennington County Sheriff's Department and First Western Bank to inquire about a sweepstakes-related solicitation that she had received. Judy and Tom argue that the fact that Mary frequently played the sweepstakes and that she had apparently been targeted by hucksters is evidence of her susceptibility to undue influence.

[¶46.] The sweepstakes-related deception that Mary reported to the Sheriff's Department was perpetrated by a person that identified himself as "Sir Michael Kensington." "Sir Kensington" attempted to scam Mary out of $6,500.00 by telling her that if she would send him a cashier's check in said amount, she would receive her sweepstakes winnings totaling $392,460.00. Instead, Mary called First Western and spoke with the branch president about the incident. The bank president advised her against paying any money and told her to report the incident to the sheriff's department. Mary did so. Thereafter, "Sir Kensington" again contacted Mary, at which time she told him that any further inquires of her should be directed to her banker. "Sir Kensington" then crudely swore at Mary and hung up the phone ending the matter. Contrary to concluding that this incident was indicative of Mary's susceptibility to undue influence, the circuit court made an oral finding that the incident evinced her ability to recognize someone who was attempting to take advantage of her.

[¶47.] Joel Pine testified that he felt Mary was not able to properly care for herself for sometime before she was actually removed from the home in 2005. He stated that he tried to talk to her about getting some help, but that she was "bullheaded" and "stern" about staying in her house and that she rejected his suggestion. He went on to testify that her attitude was not limited to matters concerning her living arrangements, but rather that it applied to "everything." He indicated that she was "strong-willed" and "very determined." He also was of the impression that her children would "listen to her when she spoke."

[¶48.] Gloria Pine indicated that Mary was "closed-mouthed" about her finances and that Gloria also considered Mary to be "strong-willed." Gloria too thought the term bullheaded fairly described Mary and that her children would probably do whatever she wanted them to do.

[¶49.] Interestingly, the contestants in this case expressed similar opinions during their testimony. Tom, characterized her as capable of being "a very controlling person." Judy even went so far as to indicate that Mary was "not too susceptible to persuasion."

[¶50.] We conclude that the forgoing accounts constitute evidentiary support for the circuit court's finding that Mary was "not at all susceptible to undue influence." Therefore the circuit court's finding is not clearly erroneous. Since Judy and Tom are unable to prove the first element of undue influence, they are unable to meet their burden of proof and we need not address the remaining elements requisite to that showing.

[¶51.] **2.** **Whether Ron breached a fiduciary duty.**

[¶52.] Since we concluded by our analysis of Issue 1 there were explanations apart from any action that Ron took within the context of his confidential relationship that could account for why Mary executed a new will and the deeds; that she had independent advice in this regard; and that in any case no undue influence could be shown, we hereby conclude that Ron did not breach a fiduciary duty prior to July 1, 2003 – the date which the circuit court found Mary to be legally incompetent. However, because the circuit court appointed a special administrator to review Mary's post-July 1, 2003 gifts and transactions for validity, a question remains as to whether Ron breached a fiduciary duty from that point forward. Since at the time of this appeal no report had yet been submitted by the special administrator we decline to consider this issue today. *See* Boever v. South Dakota Bd. of Accountancy, 526 NW2d 747, 750 (SD 1995) (opining that appellate review of an issue that has yet to become ripe amounts to issuing an advisory opinion and that even though the Court may have jurisdiction to issue such an opinion, it should refrain from doing so "if the issue is so premature that the [C]ourt would have to speculate as to the presence of a real injury") (citation omitted).

[¶53.] Affirmed.

[¶54.] SABERS, KONENKAMP, ZINTER and MEIERHENRY, Justices, concur.