#26672-rev & rem-SLZ

**2014 S.D. 4**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

EDWARD L. HUMBLE,                              Plaintiff and Appellant,

   v.

RUSS WYANT,                                    Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
PERKINS COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JOHN W. BASTIAN
Retired Judge

\* \* \* \*

JOHN W. BURKE of
Thomas, Braun, Bernard & Burke, LLP
Rapid City, South Dakota                       Attorneys for plaintiff
                                               and appellant.


RICHARD E. HUFFMAN
MICHAEL V. WHEELER of
DeMersseman Jensen Tellinghuisen
 & Huffman, LLP
Rapid City, South Dakota                       Attorneys for defendant
                                               and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
ON NOVEMBER 4, 2013

OPINION FILED **02/05/14**

#26672

ZINTER, Justice

[¶1.]        Edward L. Humble (Humble) sued Russ Wyant (Wyant) for specific performance of Humble's option to purchase a ranch owned by Wyant.  Wyant counterclaimed for rent.  The circuit court denied specific performance, finding that Humble failed to satisfy certain option conditions before the option expired.  The court also found for Wyant on his counterclaim for rent.  Humble appeals both decisions.  We reverse the judgment on the counterclaim and remand for further findings on specific performance.

*Facts and Procedural History*

[¶2.]        This case involves a dispute between family members over ownership of a 4,820 acre ranch in Perkins County.  A lengthy recitation of the facts is necessary to understand the parties' relative fault with regard to the failure of the conditions of the option to purchase.

[¶3.]        The property, owned by Wyant since 2005, is known as Humble Ranch.  Prior to Wyant's ownership, the ranch was owned by Edward F. Humble and Bessie Humble.  Edward F. and Bessie had five children: Karen, Donnalee, Bruce, Galen, and Edward L. Humble (the plaintiff and appellant).  Wyant is Karen's son and the nephew of appellant Humble.  Wyant worked on the ranch during the summers when he was in high school.  Wyant now lives in Wyoming and operates construction companies there and in Montana.

[¶4.]        Edward F. Humble died in 1992.  Bruce, who had been living on and operating the ranch since the early 1980s, acquired a half interest in the ranch.

-1-

The remaining half interest was owned by Bruce's mother, Bessie. Bruce continued to operate the ranch after Edward F. Humble's death.

[¶5.]    Under Bruce's management, the ranch began to struggle financially. In 2001, in response to a bank foreclosure, the Humble family held a meeting. Humble and Wyant both attended. As a result of the meeting, Wyant agreed to loan Bruce $190,500 to pay the bank note that was in default and bring other financial obligations current. In return for the loan, Wyant received a promissory note from Bruce. The note required annual payments of $25,000. Bruce made only one payment of $22,184.

[¶6.]    In 2005, Humble contacted Wyant about the continuing financial difficulties with the ranch. Humble feared the ranch could be lost. He also felt Bruce should no longer operate the ranch. After another family meeting, it was agreed that Wyant would purchase both Bruce's and Bessie's interests and give Humble an option to purchase the ranch. Wyant subsequently acquired both interests and gave Humble a two-year option to purchase.

[¶7.]    After Wyant acquired Bessie's and Bruce's interests, Humble's son Casey moved onto and began operating the ranch pursuant to an agreement among Wyant, Humble, Casey, and other family members. Casey testified that prior to moving onto the ranch, he and Wyant discussed whether to enter into a contract or other writing regarding Casey's occupancy. Wyant declined, indicating: "Until we get something closed, run it like it's your own." After 2005, Casey maintained the buildings, corrals, fences, and the house on the ranch. He also made improvements. Casey indicated that he did not pay rent to Wyant because Wyant never requested

it. Casey did, however, testify that he made "exchanges" with Humble, including "some cash, some not, not – not nothing that said 'rent' on a check." Casey testified that he assumed once Humble exercised the option, rent payments would belong to Humble.

[¶8.] The two-year option period commenced when Wyant provided Humble with a statement of Wyant's investment in the ranch, which would be used to establish the purchase price. Wyant provided the statement on January 10, 2006, two months later than required by the option. Humble did not dispute the statement amount or object to its untimeliness. Consequently, the option agreement would expire on January 10, 2008.

[¶9.] After receiving the investment statement, Humble or Casey contacted Wyant and orally advised him that Humble was exercising the option. In April 2006, the parties then met at Pioneer Bank and Trust (the bank). Humble, Wyant, Casey, Clay Birkeland of the bank, and Scott Nielson of the Farm Service Agency (FSA) were present. The purpose of the meeting was to discuss commercial financing terms that Humble could obtain to purchase the ranch.

[¶10.] The financing terms discussed consisted of a $200,000 FSA loan payable over 40 years at 5.625% interest. The balance of the purchase price (approximately $530,000) would be financed by the bank over 30 years at 7.5% interest. However, the FSA would not commit to participation because it wanted to further investigate whether the title to the ranch was clouded.

[¶11.] After the meeting, Wyant, Humble, and Casey met outside the bank and further discussed financing. Humble and Casey testified that Wyant promised

to notify them within twenty-four hours whether he would exercise his right under the option to match the proposed commercial financing. Wyant testified he was "not sure" if he had agreed to provide that notice. There is no dispute that Wyant did not contact Humble or Casey the next day with a financing decision. Wyant's attorney, Richard Huffman, did, however, procure a title insurance commitment in the amount of $750,000 naming Humble as a new purchaser of the property.

[¶12.] There was no communication between Humble and Wyant for several weeks following the meeting at the bank. Humble testified that during that time, he reread the option agreement and noticed that exercise of the option was required to be in writing. Therefore, Humble prepared a written notice exercising the option to purchase. He sent it to Wyant on June 30, 2006, and Wyant acknowledged its receipt.

[¶13.] The option agreement was subject to conditions that are central to this dispute. The first provided that following exercise of the option, "Russ Wyant and Edward Humble shall enter into a Purchase Agreement within thirty days." The second provided that "if the option [was] exercised, the Seller [had] the option of matching Buyer['s] proposed financing on the same terms and conditions and thereafter the Seller shall be come [sic] the lender." The option further provided: "Closing shall take place within six (6) months following the execution of the Purchase Agreement following the exercise of the option however closing must take place prior to the end of the option period." None of these conditions were satisfied before the option agreement expired. The parties' efforts to satisfy the conditions are reflected in the following facts and circumstances.

[¶14.] The record reflects that by early August 2006, slightly more than thirty days after Humble exercised the option, no purchase agreement had been executed as required. Humble subsequently hired attorney Jeff Collins to complete the purchase. On October 4, 2006, Collins sent a letter to Wyant summarizing the progression of the events since the meeting at the bank. Collins also claimed that Wyant was in default for failing to enter into a purchase agreement. Collins indicated that he would draft a purchase agreement and send it the following week; however, he did not send an agreement. Wyant's attorney, Huffman, responded to Collins's letter. Huffman indicated that Wyant intended to convey the land pursuant to the option agreement. Huffman also asked Collins to provide information regarding the financing terms Humble had available.

[¶15.] On October 27, 2006, Collins provided Huffman the financing information discussed at the April 2006 meeting at the bank. Although Wyant had requested loan commitment letters, Collins explained that neither the bank nor the FSA would provide a commitment until a purchase agreement was in place. Collins did, however, note that he had received emails from the bank and the FSA restating the financing terms that were discussed at the bank.

[¶16.] Two weeks later, on November 13, Collins sent another letter to Huffman, asking, "If you could advise as to your client's position with regard to financing, I am hopeful we can put together a Purchase Agreement and finalize the sale of this matter." On November 22, Collins also sent Huffman the two emails Collins had received from the bank and the FSA restating the financing terms discussed at the bank meeting.

[¶17.]     Collins did not receive a response from Huffman.  Therefore, Collins wrote to Huffman on December 4, 2006, inquiring about Wyant's decision to finance the sale.  Collins also stated that he would provide a draft purchase agreement within a week.  However, no purchase agreement was sent.

[¶18.]     Humble's file was then transferred to Haven Stuck, another attorney in Collins's office.  On February 14, 2007, Stuck sent a letter to Huffman.  Stuck restated the financing terms that had been previously discussed.  He also enclosed a proposed purchase agreement and suggested a closing date of April 10, 2007.

[¶19.]     Stuck's letter was not answered by Huffman.  Consequently, Stuck sent another letter to Huffman on March 5, 2007, asking for a "good faith response" from Wyant.  Stuck indicated he would commence litigation if nothing was received in three days.  Huffman responded to the letter by email the next day.  Huffman indicated that he had been unable to reach Wyant.  The email also included a recapitulation of Wyant's investment expenses that Huffman had received from Wyant.

[¶20.]     Three days later, Huffman faxed a letter to Stuck stating that Wyant had "concerns" about the sale.  Wyant stated that he wanted to ensure the ranch was kept in the family.  The letter explained that "[Wyant] would not have stepped up and paid the kind of money he has paid and continue to make payments for expenses while [Humble] and [Casey] have been using the property free of charge, if his intention was not to make sure his property stays in the Humble family."  Wyant was also concerned that it appeared to him the terms of the option agreement were changing, and a change would require the approval of the other

Humble relatives. Finally, Wyant had concerns about the lack of "terms" of the financing. Wyant wanted to know:

> Is there other collateral? Is there any money being put down? What is the security for the loans? Is there an operating line of credit that goes with it? Are there other guarantees? Is there a cross collateralization agreement or will there be?

Huffman concluded the letter by recommending that Humble, Casey, and Wyant "sit down and go over the entirety of the transaction."

[¶21.]    The following day Stuck forwarded Huffman's letter to Humble and Casey. Stuck then faxed a responsive letter to Huffman. The letter stated:

> Casey and [Humble] have not been using the property free of charge as both you and I have included interest in our calculations. They intended to complete this purchase almost one year ago and the delay is entirely due to your client.
>
> I am not aware of what terms you believe have changed. Please set out specifically any terms you believe have changed from the original deal.
>
> With regard to the financing: there is no other collateral; there is no money being put down; the security for the loans is this real estate only; there is no operating line of credit tied to these loans, although they have an operating line; the guarantors will be [Humble], Connie, and Casey; and there is no cross-collateralization agreement.

Stuck concluded by requesting a good faith response from Wyant to the offer and agreement to purchase that Stuck had sent in February 2007. On March 21, 2007, Huffman responded to Stuck by letter stating that Huffman had drafted a different purchase agreement for Wyant to review.

[¶22.]    On April 7, 2007, without the knowledge of their attorneys, Humble, Wyant, Casey, and Humble's wife met in Sturgis. The purpose of the meeting was to discuss the purchase and financing. The circuit court noted that this appeared to

be the first time the parties had personal contact since Humble exercised the option in June 2006. At the conclusion of the meeting, Humble and Casey advised Wyant they would let him know "within a week" whether they would purchase the ranch. Humble and Casey did not provide that notice. But two days later, on April 9, Stuck sent an email to Huffman acknowledging the parties' meeting in Sturgis and asking Huffman to "provide a specific response" to Humble's proposed purchase agreement "or to provide a purchase agreement that is agreeable to Wyant."

[¶23.] On April 9, Wyant complied. He drafted and signed his own purchase agreement. Wyant would later testify that he did not like the agreements drafted by Stuck or Huffman. Wyant also indicated that he signed the purchase agreement because he questioned whether Humble was truly interested in buying the ranch. Wyant sent his purchase agreement to Huffman, who forwarded it to Stuck on April 12, 2007. Although Humble received Wyant's purchase agreement the next day, Humble never objected or responded to Wyant's signed agreement.

[¶24.] There was no further communication between the parties until August 2007, when Humble retained a new lawyer, Thomas Tobin. Tobin wrote to Huffman advising him that Humble and Casey were "ready, able, and willing" to complete the purchase. However, Humble did not sign a purchase agreement.

[¶25.] On December 27, 2007, a little more than two weeks before the option was scheduled to expire, Tobin sent another letter to Huffman indicating Humble's desire to complete the purchase. Tobin stated that Humble had secured all necessary financing although the details were not disclosed. Tobin alleged that any time periods not met under the option agreement were the fault of Wyant. Tobin

also advised that Humble was ready to close on 48-hour notice. The record is not clear whether Huffman or Wyant responded. But again, there is no dispute that Wyant's proposed purchase agreement was not signed by Humble, Humble made no counterproposals or objections to Wyant's purchase agreement, and no further negotiations occurred between Humble and Wyant. The option agreement ultimately expired on January 10, 2008, without a purchase agreement having been executed.

[¶26.]    Humble initiated this action for specific performance in June 2008. Wyant counterclaimed, alleging that Humble owed Wyant rent for the time Casey operated the ranch. A court trial was held in August 2012.[1]

[¶27.]    The circuit court denied Humble's request for specific performance. The court concluded that the option agreement had expired, and "while there was evidence that both parties did not comply with the option agreement, [Humble]'s noncompliance was material." With respect to the purchase agreement condition, the court noted that no purchase agreement was ever completed even though Wyant provided Humble with a signed purchase agreement. With respect to the financing condition, the court indicated that Humble "clearly had the burden to establish financing terms that were of sufficient specificity to be matched by the defendant," yet Humble failed to do so. The circuit court found that the FSA would not finance any portion of the loan due to a cloud on the title. And without a guarantee from the FSA, the circuit court found that there was no evidence the bank or any other

---

1.    Humble's attorney on appeal, John Burke, entered his notice of appearance on behalf of Humble on September 3, 2011. Burke represented Humble at trial.

bank would finance the entire purchase. In sum, the court concluded that Humble "'has not fully and fairly performed all the conditions precedent on his part' and therefore specific performance cannot be enforced in his favor" under SDCL 21-9-5.[2] With respect to the counterclaim, the court found that Wyant and Humble had an implied or express contract requiring Humble to pay Wyant rent from October 1, 2005—the time "Humble" had possession—until March 1, 2013. The court awarded Wyant $334,153.52 in rent and prejudgment interest. Humble appeals both decisions.

<em>Decision</em>

*Specific Performance*

[¶28.]        Humble argues that the circuit court erred in declining to specifically enforce the timely exercised option. "An option contract is an irrevocable offer by the owner to sell on specified terms and creates a power of acceptance in the optionee." *Advanced Recycling Sys., L.L.C. v. Se. Props. Ltd. P'ship*, 2010 S.D. 70, ¶ 12, 787 N.W.2d 778, 783 (citations omitted). "Although an option to purchase real estate is initially unilateral in nature, upon timely acceptance it becomes a mutually binding contract capable of enforcement and subject to the same rules as a bilateral contract." *Kuhfeld v. Kuhfeld*, 292 N.W.2d 312, 314 (S.D. 1980) (citing *Renner v. Crisman*, 80 S.D. 532, 536, 127 N.W.2d 717, 719 (1964)).

[¶29.]        In this case, neither party contests the court's finding that the option was timely exercised. Therefore, both Humble and Wyant became parties to a

---

2.    The court also determined that time was not of the essence in fulfilling these terms of the option contract.

mutual, bilateral agreement. *See Kuhfeld*, 292 N.W.2d at 314. However, "[s]pecific performance is an equitable remedy . . . ." *Lamar Adver. of S.D., Inc. v. Heavy Constructors, Inc.*, 2008 S.D. 10, ¶ 10, 745 N.W.2d 371, 375 (quoting *Amdahl v. Lowe*, 471 N.W.2d 770, 773 (S.D. 1991)). To determine whether specific performance is appropriate, the court must "balance the equities present in the case." *Metro Motors v. Nissan Motor Corp.*, 339 F.3d 746, 750 (8th Cir. 2003). "The equities of each fact situation" in an action for specific performance "are of paramount importance." *Cook v. Rezek*, 89 S.D. 667, 671, 237 N.W.2d 18, 20 (1975).[3]

[¶30.]     In denying Humble's request for specific performance, the circuit court applied SDCL 21-9-5. That statute generally prohibits specific performance in favor of a party who has not fully and fairly performed a condition precedent. The statute provides:

> Specific performance cannot be enforced in favor of a party who has not fully and fairly performed all the conditions precedent on his part to the obligation of the other party, except when his failure to perform is only partial, and either entirely immaterial or capable of being fully compensated; in which case specific performance may be compelled, upon full compensation being made for the default.

SDCL 21-9-5.

---

3.    "We review a circuit court's decision regarding an equitable remedy under the abuse of discretion standard." *McCollam v. Cahill*, 2009 S.D. 34, ¶ 6, 766 N.W.2d 171, 174 (citations omitted). "We review the circuit court's findings of fact under the clearly erroneous standard." *Id.* (citing *In re Estate of Smid*, 2008 S.D. 82, ¶ 11, 756 N.W.2d 1, 5-6). "A trial court's finding is clearly erroneous if, after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been made." *In re Estate of Pringle*, 2008 S.D. 38, ¶ 18, 751 N.W.2d 277, 284 (quoting *In re Estate of Dokken*, 2000 S.D. 9, ¶ 10, 604 N.W.2d 487, 490-91).

[¶31.]     The court denied specific performance, reasoning that Humble had not fully and fairly performed all the conditions precedent of the option agreement. Humble argues that the circuit court erred because it placed a greater burden on him to perform the conditions of the agreement and did not adequately consider whether Wyant frustrated Humble's ability to comply. We disagree because, in balancing the equities necessary for equitable relief, the court expressly acknowledged that both parties did not comply with the option agreement. The court denied specific performance because Humble's noncompliance was "material."

[¶32.]     The record supports the circuit court's findings. Both Humble's and Wyant's acts and omissions contributed to the failure to enter into a purchase agreement before the option agreement expired.[4] Neither party even proposed a purchase agreement until February 2007, six months after the time required for the parties to finalize the purchase agreement. Thereafter, Wyant failed to sign or provide objections to Humble's proposed agreement. But just two days after the April 2007 meeting in Sturgis, Wyant drafted a purchase agreement, signed it, and delivered it to Humble. Although Tobin later claimed that Humble was willing to close before the option expired, Humble did not sign, object, or even respond to

---

4.     Humble also argues that the circuit court erred in concluding that the option had expired. After the option was exercised, the resulting agreement required the parties to close the sale prior to the end of the option period. Although the court found that time was not of the essence in fulfilling two conditions, the option clearly expired two years after Wyant provided his investment expenses. The circuit court did not err in concluding that the option expired on January 10, 2008.

Wyant's signed purchase agreement.[5]  Thus, the circuit court did not clearly err in finding that Humble's noncompliance was material.

[¶33.]    The court also found that Humble failed to perform the second condition by failing to provide terms of commercial financing that were actually available to him.  The circuit court found that "[Humble had] not provided [Wyant] with a viable financing plan and [had] not produced or provided any evidence, in any form, reflecting the terms of an actual loan commitment.  Thus, [Wyant] has been left without a financing arrangement to match."  These findings are not clearly erroneous.

[¶34.]    As the circuit court noted, the only financing terms ever disclosed by Humble were those discussed during the April 2006 meeting at the bank.  But there is no dispute that those terms were not available because the FSA would not commit to financing after its discovery of the cloud on the title.  And without the FSA financing, there was no evidence that the bank would have financed the entire loan on any identified terms.  Ultimately, Humble failed to identify any terms of actually available financing.

---

5.    At trial, Humble argued that he should not be faulted for failing to sign Wyant's purchase agreement because it was materially defective.  More specifically, Humble stated that he was unwilling to sign Wyant's proposed purchase agreement because it did not describe what property he would be purchasing for more than $700,000.  Wyant contended that his proposed purchase agreement described the property because the proposed purchase agreement incorporated the option.  We agree with Wyant.  Further, if Humble actually believed the agreement was defective, he had some obligation to respond, object, or take some further act to finalize a purchase agreement before the option expired.

[¶35.] Considering all of the facts, the circuit court did not clearly err in finding that Humble was the party who was materially at fault for the failure of the conditions. And because Humble was the party who was materially at fault, the court did not abuse its discretion in denying specific performance.[6]

[¶36.] Humble, however, argues that even if he was materially at fault for the failure of the conditions precedent, the circuit court erred in failing to consider the part of SDCL 21-9-5 that allows specific performance if the defaulting party's failure to perform is partial and the other party is capable of being fully compensated. *See* SDCL 21-9-5 (providing that specific performance may be enforced against a defaulting party "when his failure to perform is only partial, and either entirely immaterial or capable of being fully compensated; in which case specific performance may be compelled, upon full compensation being made for the default").

[¶37.] Humble raised this issue before the circuit court. But the record does not reflect that the court considered whether specific performance was appropriate under this exception. We therefore remand for findings of fact, conclusions of law, and reconsideration of specific performance under this exception.[7] The court must

---

6. Humble argues that Wyant made it difficult for him to obtain a loan commitment letter because a purchase agreement was a precondition to obtaining a commitment letter. But as previously noted, it was Humble who declined to sign, object, or respond to the only purchase agreement that was ever signed by either party.

7. Because we are remanding on this issue, we do not address Humble's argument that the circuit court erred in failing to require Wyant to pay $46,000 if the option terminated without Humble's purchase of the property. This issue should also be considered on remand.

consider: (1) whether Humble partially performed; and if so, (2) whether Wyant is capable of being fully compensated for Humble's failure to fully perform. We remand for further proceedings consistent with this opinion.[8]

*Counterclaim*

[¶38.] Humble argues that the court erred in finding for Wyant on his counterclaim for rent and prejudgment interest. The court awarded damages on the theory that Wyant and "Humble" had an express or implied contract requiring Humble to pay rent while Casey occupied and operated the ranch.

[¶39.] A contract can either be express or implied, but not both. SDCL 53-1-3. "An express contract is one, the terms of which are stated in words. An implied contract is one, the existence and terms of which are manifested by conduct." *Id.* "An express contract results when the parties mutually express an intent to be bound by specific terms and conditions." *Weitzel v. Sioux Valley Heart Partners*, 2006 S.D. 45, ¶ 22, 714 N.W.2d 884, 892 (quoting *Werner v. Norwest Bank S.D., N.A.*, 499 N.W.2d 138, 141 (S.D. 1993)). Unlike an express contract:

> A contract is implied in fact where the intention as to it is not manifested by direct or explicit words by the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used, or acts done by them, or other pertinent circumstances attending the transaction.

*Id.* (quoting *Setliff v. Akins*, 2000 S.D. 124, ¶ 12, 616 N.W.2d 878, 885).

---

8. Because Judge Bastian retired, additional evidence may be considered in the discretion of the court if a different circuit judge hears this case. If retired Judge Bastian hears the matter, further proceedings should be confined to the existing record.

[¶40.]     The circuit court first concluded that Humble and Wyant had expressly contracted for rent.  The court determined that an express contract was found in "[t]he agreement to have Casey occupy the ranch[, which] is derived from the option contract upon which [Humble] has sought specific performance."  The existence of an express contract is a question of law that we review de novo.  *Lane v. Travelers Indem. Co.*, 1997 S.D. 58, ¶ 12, 563 N.W.2d 423, 425.

[¶41.]     An express contract requires mutually expressed "intent to be bound by specific terms and conditions."  *Weitzel*, 2006 S.D. 45, ¶ 22, 714 N.W.2d at 892 (quoting *Werner*, 449 N.W.2d at 141).  Although the court concluded that an express contract to pay rent arose from the agreement to have Casey occupy the ranch as a part of the option to purchase, neither the agreement nor the option contains any term requiring Humble to pay rent during the time that Wyant allowed Casey to occupy and operate the ranch.[9]  On the contrary, the option suggested that no rent was contemplated.  Paragraph 5 of the option only required that Humble pay Wyant "a reasonable return on his investment, not to exceed ten (10) percent per annum" *if* Humble purchased the property, a fact that did not occur.  Moreover, in 2005, Casey asked Wyant about writing a lease.  Wyant declined, and then instructed Casey: "Until we get something closed, run it like it's your own."  Wyant did not refute this testimony.  Wyant further admitted that the Humbles had offered to lease the

---

9.     The court may have been referring to the family purchase agreement by which Wyant was to purchase Bessie's 50% interest.  That agreement did provide that Wyant would "have a Humble relative run the [ranch] until the expiration of the Option Agreement."  However, there is also no language in that purchase agreement evidencing an agreement between Wyant and Humble for Humble to pay rent during Casey's occupation and operation of the ranch.

ranch from him in 2005, and had actually faxed a proposed lease to him with a rental rate of $7.00 per acre. But the lease was not executed. Because there is no evidence of language expressly obligating Humble to pay Wyant rent, the circuit court erred in concluding that an express contract required Humble to pay rent.

[¶42.]      Alternatively, the court found that there was "substantial evidence" of an implied contract. "We look to the totality of the parties' conduct to learn whether an implied contract can be found." *Setliff*, 2000 S.D. 124, ¶ 13, 616 N.W.2d at 885 (quoting *In re Estate of Regennitter*, 1999 S.D. 26, ¶ 12, 589 N.W.2d 920, 924). "The existence and governing terms of any implied contract present questions of fact . . . ." *Holland v. FEM Elec. Ass'n, Inc.*, 2001 S.D. 143, ¶ 6, 637 N.W.2d 717, 719 (quoting *Jurrens v. Lorenz Mfg. Co. of Benson, Minn.*, 1998 S.D. 49, ¶ 9, 578 N.W.2d 151, 154).

[¶43.]      In finding the existence of an implied contract, the circuit court reasoned that "[*Humble*] has always been treated and considered as the party in possession of the ranch." This finding does not support the existence of an implied contract with Humble. There is no dispute that during the relevant times in question, Casey was the party who was occupying and operating the ranch pursuant to an oral agreement with Wyant. As the circuit court found, Casey moved onto and operated the ranch pursuant to the 2005 family agreement, an agreement to which Wyant was a party. Furthermore, as previously noted, when Wyant was specifically asked about a written lease, he declined, telling Casey (not Humble) to "run [the ranch] like it's your own." Therefore, even if possession of the premises suggested

some type of agreement to pay rent, the implied agreement was with Casey, not Humble.

[¶44.]     Wyant, however, argues, and the court found, that the existence of an implied contract should be found because Casey made exchanges or payments to Humble over the seven years that Casey occupied and operated the ranch. Specifically, the court relied on Casey's statement that he made exchanges with Humble, which included "some cash, some not, not – not nothing that said 'rent' on a check." The court indicated that Humble exercised control over the ranch during the relevant time period and received a direct financial benefit as a result of Casey's occupancy.

[¶45.]     These facts do not support the existence of an implied contract with Humble. First, although Casey may have derived an economic benefit from occupying and operating the ranch, the court did not identify what economic benefit Humble received. The only benefit that may have arisen would have been that suggested in Casey's one statement about some "exchanges" between Casey and Humble. But that testimony was vague and insufficient to suggest that Humble had impliedly agreed to pay rent to Wyant for Casey's use and operation of the ranch from 2005 until March 1, 2013. Moreover, Wyant's conduct directly contradicted a finding of implied contract with Humble. Wyant, through counsel, confirmed that the ranch would be occupied and operated without rent no matter who was considered to be occupying and operating the premises. In his March 2007 letter to Humble's attorney, Wyant's attorney confirmed that "[Wyant] would not have stepped up and paid the kind of money he has paid and continue to make

payments for expenses while [Humble] and [Casey] have been *using the property free of charge* if his intention was not to make sure his property stays in the Humble family." Wyant also never requested a rent payment. On the contrary, he declined Casey's suggestion of a written agreement and he declined to enter into a written rental agreement when one was faxed to him.

[¶46.] In finding an implied contract and in determining the amount owed, the circuit court also relied on Humble's post-trial brief in which counsel argued that if Humble prevailed on his request for specific performance, "Humble shall also pay [Wyant] pecuniary compensation . . . plus $244,615.00 (interest/rent from October 1, 2005 – December 31, 2012) . . . ." Humble contends that this argument does not evidence conduct of the parties reflecting an implied contract for Humble to pay Wyant rent. We agree. This argument was asserted to reflect the amount of interest or pecuniary compensation that Wyant was entitled to receive under the option agreement if specific performance had been granted, an event that did not occur.[10]

[¶47.] Ultimately, the evidence does not support a finding of implied contract. And even if it did, any such contract was with Casey, who occupied and operated the ranch pursuant to an agreement with Wyant. The court's finding that Humble impliedly agreed to pay rent is not supported by the evidence.

[¶48.] We reverse the counterclaim and remand for additional findings on specific performance.

---

10. Under paragraph 5 of the option, Humble was obligated to pay Wyant "a reasonable return on his investment, not to exceed ten (10) percent per annum" if Humble exercised the option.

#26672

[¶49.] GILBERTSON, Chief Justice, and KONENKAMP, SEVERSON, and WILBUR, Justices, concur.