#28200-a-GAS
**2018 S.D. 3**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

SHIRLEY HARVEY and
DON HARVEY,                                             Plaintiffs and Appellants,


v.


REGIONAL HEALTH NETWORK,
INC.; REGIONAL HEALTH, INC.;
RAPID CITY REGIONAL HOSPITAL,
INC.; TIMOTHY SUGHRUE; DALE
GISI; SHERRY BEA SMITH; and
KATHEYRN L. SHOCKEY,                           Defendants and Appellees.


\* \* \* \*
APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA
\* \* \* \*
THE HONORABLE JANE WIPF PFEIFLE
Judge
\* \* \* \*


GARY D. JENSEN
BRETT A. POPPEN of
Beardsley, Jensen & Lee,
  Prof, LLC
Rapid City, South Dakota                          Attorneys for plaintiffs and
                                                               appellants.


JEFFREY G. HURD
SARAH BARON HOUY of
Bangs, McCullen, Butler,
  Foye & Simmons, LLP
Rapid City, South Dakota                          Attorneys for defendants and
                                                               appellees.
.
                                        \* \* \* \*


                                                               ARGUED NOVEMBER 7, 2017
                                                               OPINION FILED **01/03/18**

#28200

SEVERSON, Justice

[¶1.]    The director of a senior care facility terminated an employee after two coworkers reported that the employee had slapped and secluded a resident in the facility.  The employee maintained that the accusations were false and invoked the employer's grievance procedure.  The employer sustained its decision to terminate the employee.  Thereafter, the employee brought suit against the employer and certain management staff for slander, malicious prosecution, intentional infliction of emotional distress, punitive damages, wrongful discharge, negligent infliction of emotional distress, loss of consortium, and breach of contract.  The employer and management staff moved for summary judgment on all causes of action, which motion the circuit court granted.  The employee appeals.  We affirm.

## Background

[¶2.]    Regional Health, Inc. is the parent company of Regional Health Network, Inc.  Regional Network operates multiple acute care and senior care facilities, including Golden Ridge Regional Senior Care located in Lead, South Dakota.  Shirley Harvey worked as a personal care attendant at Golden Ridge from March 2001 until her termination on June 8, 2012.  While at Golden Ridge, Harvey received regular performance evaluations.  Those evaluations praised Harvey on her care of the residents and her work ethic.  For example, her March 2012 evaluation noted that she goes above and beyond for residents; is flexible and willing to help whenever needed; is willing to help find improvements, keeps the director informed in a timely manner, supportive of change, and encourages others about change; and ensures resident safety and provides appropriate care.

[¶3.]        Harvey's personnel file also included conference statements summarizing meetings between Harvey and management.  In 2011, one statement indicated that Harvey was not supportive of coworkers, that coworkers did not want to work with Harvey due to her attitude toward them, and that coworkers are afraid to work with Harvey.  In her deposition, Harvey explained that the coworker referred to in the conference statements was likely Jessica Strong Edstrom.  Harvey did not approve of Edstrom's rough demeanor, the fact that Edstrom did not pull her weight at work, and that Edstrom smoked cigarettes, drank energy drinks, and took several breaks.

[¶4.]        It is undisputed that because of Harvey's interactions with her peers, Harvey received coaching sessions about her communication style and coworker support.  In February 2012, Harvey received a corrective action for her continued negative interactions with coworkers.  Then in April 2012, Harvey received another corrective action after she and Edstrom had a heated dispute related to a resident needing help.  The dispute resulted in Harvey and Edstrom being required to meet with Kathe Shockey and Joelle Meade.  Shockey was the human resources director at Golden Ridge and at the Lead-Deadwood Regional Hospital.  Joelle Meade was the director at Golden Ridge.  Harvey and Edstrom relayed their versions of the incident to Shockey and Meade.  Meade told them they were both at fault.  Shockey commented about the repeated issues related to Harvey's communication style.  When Edstrom expressed that she was afraid to address anything with Harvey, Harvey laughed out loud and made light of the issue.  Shockey informed Harvey

that she was being inappropriate, and later when Harvey did not change her behavior, Shockey told Harvey that she was acting unprofessional.

[¶5.] In response to Shockey's comments to Harvey during the April 2012 incident, Harvey filed a grievance against Shockey. She alleged that Shockey had humiliated and degraded her at the April 2012 meeting. But the grievance policy did not apply to Harvey's issue. Therefore, Harvey was informed that her grievance would not be processed. She, however, was also told that she could issue a complaint against Shockey. Harvey did not issue a complaint.

[¶6.] Harvey also struggled interacting with coworker Joelle Ellenbecker. According to Harvey, Ellenbecker was angry at her because Harvey and her husband had complained to Meade and Shockey about several employees' tattoos, piercings, and baggy pants. After Harvey complained, Golden Ridge enforced stricter grooming standards, which required Ellenbecker to take out her nose piercing.

[¶7.] On June 1, 2012, Ellenbecker and Edstrom reported to Meade that they saw Harvey slap a resident on the hand and mouth and put that same resident in the resident's room for approximately ten minutes after an incident involving food. Harvey now claims Ellenbecker and Edstrom made the reports only after Meade solicited them in response to a conversation Meade had overheard about certain employees needing to be fired. Regardless, it is undisputed that the resident allegedly slapped and secluded by Harvey has dementia and is known to be difficult to work with. Harvey often cared for the resident and had been known for being able to calm the resident.

[¶8.]    It is also undisputed that neither Edstrom nor Ellenbecker reported the alleged abuse immediately.  When Edstrom and Ellenbecker reported the alleged abuse to Meade, they claimed that other residents and other employees were present when the incident occurred.  Meade asked Edstrom and Ellenbecker to provide written statements, which statements they provided on June 4, 2012.

[¶9.]    In response to Edstrom's and Ellenbecker's verbal reports, Meade contacted Shockey and Rita Stacey.  Stacey was the director of nursing.  They discussed the allegations.  According to Shockey, Meade recommended that Harvey be terminated.  Meade later testified that she did not recall making that recommendation without first speaking to Harvey.  Meade, however, conceded that during her investigation of the allegations, she did not ask other employees if they had witnessed Harvey mistreat any residents; nor did she question any residents.

[¶10.]    On June 4, Shockey sent an email to Dale Gisi.  Gisi was the vice president of human resources for Regional Health, Inc.  Shockey informed Gisi of the allegations against Harvey and noted that Meade had not visited with Harvey.  Shockey told Gisi that Meade was "requesting termination" of Harvey.

[¶11.]    On June 5, Meade called the Department of Health to ask how to make a report of abuse.  Meade had not yet met with Harvey.  An email within the Department's files documenting the call indicated that Meade reported to the Department that "a CNA had been verbal with and slapp[ed] a resident with dementia[.]"  The email further indicated that Meade said she had been told by Regional's legal department and lawyers that she was to contact the Department.  She explained that she had waited to call until the reporting employee had provided

a written statement. Meade informed the Department that she would send her report regarding the allegations as well as the employee's statement reporting the alleged abuse by the CNA. Meade later testified that she did not send the Department Edstrom's and Ellenbecker's statements or her report regarding the abuse within five days as required by ARSD 44:70:01:07. But she claimed that she initially reported the allegations of abuse because she was required to do so under mandatory reporting laws.

[¶12.] On June 6, Meade and Shockey met with Harvey. Harvey denied slapping the resident. She admitted that she tapped the resident's hand and that she had taken the resident to the resident's room because the resident was using bad language. Following the interview with Harvey, Meade opined that she believed the accusations were true. Meade later testified that she relied on her recent observations of a change in behavior between Harvey and the resident. According to Meade, Harvey showed less tolerance for and increased frustration with the resident. Meade also relied on the allegations, especially by Ellenbecker whom she found credible. Meade recommended that Harvey be terminated.

[¶13.] According to Meade, prior to terminating Harvey, she met with Shockey, Rita, Sherry Bea Smith, and Regional's legal department. Smith was the administrator of the Golden Living Center. Gisi also participated. Meade later explained that the group reviewed the information gathered and made a "consensual decision" to terminate Harvey.

[¶14.] On June 8, Meade presented Harvey a corrective action form indicating her termination for: "Gross misconduct—seclusion of a resident

involuntarily in their room as a result of misbehavior. Reported by multiple sources that employee slapped the hands and mouth of resident." Termination was based on "progressive discipline actions." Harvey refused to sign the corrective action form and the form indicating her change in employee status.

[¶15.] On June 19, 2012, Harvey submitted an employee grievance form. She described her grievance as:

> On 6-6-12, it was read to me 2 pages of allegations with no chance to defend myself. I was refused copies of these allegations. These allegations were so serious as to terminate my position on 6-8-12. Why were they not brought before me after each incident was supposedly to have happened?

She described the "[d]esired [s]olution" as:

> 1) I want and need my name cleared. I have been doing caregiving since 1999; please see attached paper. 2) I would like all people involved with these allegations and[sic] dealt with accordingly. 3) I wish for the residents' care, safety, and security; without them being afraid of reprimand.

On June 25, Meade reviewed Harvey's grievance and replied in writing:

> I have reviewed the grievance that was submitted to me by Shirley Harvey. Legal counsel was consulted regarding the matter at hand. Legal counsel supports the decision for terminating and indicated there is validity in the action taken based on reported incidences. The identity of the witnesses will not be revealed to the former employee.

Meade later testified that she made the decision to sustain the termination based on her recent investigation of the accusations.

[¶16.] Shockey mailed Meade's reply to Harvey. Shockey's letter informed Harvey that "[t]his completes Step One of the grievance procedure" and that Harvey could appeal to Step Two. On June 28, 2012, Harvey appealed Meade's decision. Harvey wrote that the allegations never happened and that she never did and never

would hurt or cause harm to residents. She questioned why she was being refused the names of her accusers. She requested her "record to be cleared of all these false accusations and fabricated lies."

[¶17.]     On July 2, 2012, Smith emailed Shockey that she had reviewed Harvey's appeal. Smith explained that "[i]t is imperative that there is a 'no tolerance' approach to any level of resident abuse, be it physical, seclusion, or intimidation." Smith supported Harvey's termination "[b]ased on eye witness accounts of both inappropriate physical contact and imposed seclusion[.]" Smith later testified that she did not independently identify or interview witnesses. She relied on the documents obtained and her discussions with Shockey and Meade during the investigation.

[¶18.]     On July 6, 2012, Harvey appealed Smith's decision. She denied that the abuse ever happened. She called the "so called witnesses to the incidents" vicious. She claimed that there are "many, many good, credible and reputable folks" willing to testify against the false accusations. Harvey named no particular witness. Harvey also detailed her awards as caregiver of the year. She encouraged those involved to review every angle of the case. She explained that she loved what she did and the people she took care of. She challenged the credibility of the alleged accuser, listing the failings of that employee as compared to Harvey's quality work ethic. Harvey asked for the situation to be rectified.

[¶19.]     On August 17, 2012, Timothy Sughrue, the CEO of Regional Health Network, and Gisi issued a letter to Harvey denying her appeal. Glenn Bryant as Regional Health's chief operations officer was required to participate in the

grievance procedure. He later testified that he recommended to Gisi and Sughrue that Harvey's appeal be denied. Bryant claimed he relied on his discussions with Shockey and Smith regarding the allegations. Sughrue claimed that he relied on the information that had been provided to him and also considered his discussions with Bryant, Smith, and the legal department. Gisi testified that he based his decision on his conversations with Shockey and Smith and the information he obtained about Harvey's termination from Shockey. Shockey had provided Gisi the documentation from the investigation that outlined the accusers' allegations and contained timelines related to the allegations. Shockey informed Gisi that she supported Harvey's termination. Shockey referred to the information obtained by Edstrom, Ellenbecker, Meade, and Harvey. She recognized that Edstrom and Harvey "had conflict" in the past and that both Harvey and Edstrom were "in the final steps of corrective action." Shockey remarked that of the employees documenting the incident, Ellenbecker was high performing and trustworthy. Shockey opined that "the accounts documented . . . are valid and have accurately represented actual, witnessed incidents."

[¶20.]     In the letter denying her appeal, Sughrue and Gisi informed Harvey that they found that she inappropriately secluded a resident and slapped the hand and mouth of a resident. They also noted Harvey's previous corrective actions in February and April 2012. According to the letter, Harvey's termination "follows Regional Health's progressive discipline process as outlined in policy." Sughrue and Gisi informed Harvey that her termination was "appropriate based on the investigation and conclusion regarding gross misconduct."

[¶21.] After her termination, Harvey sought unemployment benefits. Regional Health objected based on Harvey's gross misconduct. After a hearing during which Shockey, Meade, Ellenbecker, Edstrom, and Harvey testified, the administrative law judge for the Department of Labor found that Harvey's conduct did not rise to the level of gross misconduct necessary to disqualify her from receiving unemployment benefits. Regional Health appealed, and the circuit court affirmed the Department's decision.

[¶22.] Also following her termination, Harvey was prosecuted for felony elder abuse. In August 2012, the Department of Health had submitted Meade's June report of possible elder abuse to the Lawrence County States Attorney's Office for investigation. The Lawrence County State's Attorney's Office forwarded the Department's information to the Lead Police Department. Officer Jeremiah Fredricksen investigated the allegations. He interviewed Ellenbecker, Harvey, Meade, Edstrom, and others and issued a report. Based on his investigation, Officer Fredricksen did not believe that Harvey's actions were abusive in nature. He recommended that no further action be taken.

[¶23.] State's Attorney John Fitzgerald disagreed with Officer Fredricksen's recommendation. He convened a grand jury, which indicted Harvey on charges of felony elder abuse. Harvey's case proceeded to a jury trial. At the conclusion of the State's case, Harvey moved for a judgment of acquittal. The circuit court granted her motion, concluding that "the State has failed to establish any injury at all."

[¶24.] In December 2013, Harvey and her husband brought suit against Regional Health Network, Inc., Regional Health, Inc., Rapid City Regional Hospital,

Inc., Timothy Sughrue, Dale Gisi, Sherry Bea Smith, and Katheryn Shockey. We will collectively refer to the defendants as "Regional Health" unless reference to a particular defendant is necessary. Harvey and her husband alleged causes of action for slander, intentional infliction of emotional distress, malicious prosecution, wrongful termination, negligent infliction of emotional distress, breach of contract, loss of consortium, and punitive damages. After several years of discovery, Harvey moved for partial summary judgment on her claim for breach of contract. Regional Health moved for summary judgment on all causes of action asserted by Harvey and her husband. The circuit court held a hearing on March 15, 2017. The court denied Harvey's motion and granted Regional Health summary judgment in all respects.

[¶25.]     Harvey appeals, challenging the circuit court's decision granting Regional Health summary judgment. She argues that disputed issues of material fact exist on each cause of action.

## Standard of Review

[¶26.]     As we recently stated in *State v. Wayfair Inc.*:

> We review a summary judgment de novo. *Heitmann v. Am. Fam. Mut. Ins. Co.*, 2016 S.D. 51, ¶ 8, 883 N.W.2d 506, 508 (citing *Ass Kickin Ranch, LLC v. N. Star Mut. Ins. Co.*, 2012 S.D. 73, ¶ 7, 822 N.W.2d 724, 726). We determine whether there are any "genuine issues of material fact" in the case and "whether the law was correctly applied." *Id.* (quoting *Ass Kickin Ranch*, 2012 S.D. 73, ¶ 6, 822 N.W.2d at 726). If there are no genuine issues of material fact, "our 'review is limited to determining whether the [circuit] court correctly applied the law.'" *Id.*

2017 S.D. 56, ¶ 13, 901 N.W.2d 754, 760. In reviewing whether there is a genuine issue of material fact, "[w]e view the evidence 'most favorably to the nonmoving

party and reasonable doubts should be resolved against the moving party.'"

*Dowling Family P'ship v. Midland Farms, LLC*, 2015 S.D. 50, ¶ 9, 865 N.W.2d 854, 859 (quoting *Peters v. Great W. Bank, Inc.*, 2015 S.D. 4, ¶ 5, 859 N.W.2d 618, 621).

## Analysis

### 1. Slander

[¶27.]     Slander is defined as: "a false and unprivileged publication, other than libel, which: (1) Charges any person with crime, . . . (3) Tends directly to injure him in respect to his office, profession, trade, or business, . . . or (4) By natural consequence, causes actual damage." SDCL 20-11-4. For purposes of summary judgment, we assume that the publications against Harvey were false. We note that Harvey did not bring suit against the persons accusing her of slapping and secluding a resident, namely Edstrom and Ellenbecker. Nonetheless, according to Harvey, Regional Health slandered her when it published the false accusations to the Department of Health, the victim resident's husband, Officer Fredricksen, and internally. Harvey concedes that Regional Health's communications were conditionally privileged under SDCL 20-11-5(3) because the Department, the husband, law enforcement, and the company are "person[s] interested therein[.]" But she asserts that Regional Health, Sughrue, Gisi, Smith, and Shockey lost their privilege when they had no reasonable grounds for believing the accusations to be true and acted in reckless disregard of the truth.

[¶28.]     Under SDCL 20-11-5(3), "[a] privileged communication is one made: . . . [i]n a communication, *without malice,* to a person interested therein, by one who is also interested, or by one who stands in such relation to the person interested as

to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information[.]" (Emphasis added.) The statute further provides that "malice is not inferred from the communication or publication." *Id.* Instead, "there must be a specific showing of malice which requires proof of reckless disregard for the truth or actual malice." *Petersen v. Dacy*, 1996 S.D. 72, ¶ 8, 550 N.W.2d 91, 93; *accord Schwaiger v. Avera Queen of Peace Health Servs.*, 2006 S.D. 44, ¶ 10, 714 N.W.2d 874, 878. The plaintiff bears the burden of proving malice sufficient to destroy the privilege. *Kieser v. Southeast Prop.*, 1997 S.D. 87, ¶ 15, 566 N.W.2d 833, 838. Actual malice can be proved with evidence that the defendant entertained serious doubts as to the truth of his or her publications. *Id.* But "[r]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *Dacy*, 1996 S.D. 72, ¶ 8, 550 N.W.2d at 93 (quoting *Janklow v. Viking Press*, 459 N.W.2d 415, 419 (S.D. 1990), *overruled on other grounds by Paint Brush Corp., Parts Brush Div. v. Neu*, 1999 S.D. 120, 599 N.W.2d 384). "[T]he evidence must permit the conclusion that the defendant actually had a high degree of awareness of probable falsity." *Janklow*, 459 N.W.2d at 419 (citing *Garrison v. Louisiana*, 379 U.S. 64, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964)).

[¶29.] Harvey contends that the circuit court erroneously required her to prove malice by clear and convincing evidence. She directs this Court to the circuit court's statement: "I do not find clear and convincing evidence of malice here[.]" In Harvey's view, although one must prove malice by clear and convincing evidence to

pursue a claim for punitive damages, Harvey needed only to identify a genuine issue of material fact regarding malice to pursue her slander claim.

[¶30.] From our review of the entire transcript from the hearing, the court applied the correct burden of proof. The court and the attorneys for both parties repeatedly used the phrase "clear and convincing evidence" when discussing malice. But the court at the outset recognized the controlling standard. It referred to *Dacy*, and said, "A specific showing of malice is required for purposes of raising a genuine issue of material fact." *See* 1996 S.D. 72, ¶ 8, 550 N.W.2d at 93. The court then granted Regional Health's motion for summary judgment, concluding that Harvey failed to make a specific showing that any of the defendants engaged in reckless disregard for the truth or that they entertained serious doubts regarding the truth of the communications.

[¶31.] Harvey next claims that the court erred in granting summary judgment because disputed issues of material fact exist on the question whether Regional Health had no reasonable grounds to believe the accusations. Harvey relies on the evidence that she had a heated, contentious relationship with Edstrom and Ellenbecker, that Regional Health knew Edstrom was "worthless and had no business working [at Golden Ridge]," that Edstrom had been repeatedly disciplined, that both Edstrom and Ellenbecker reported the allegations after the fact, and that Regional Health did not ask other staff or residents about the allegations. Harvey also claims that disputed issues of material fact exist on whether Regional Health acted in reckless disregard for the truth because—had Regional Health not

deliberately avoided learning the truth—it would have learned from employees Karin Tyler and Heidi Covell that the allegations were false.

[¶32.] Viewing Harvey's evidence in a light most favorable to her, she has not met her burden of proof. Because malice cannot be inferred, Harvey must make a specific showing these defendants—Regional Health, Sughrue, Gisi, Smith, and Shockey—at the times they made the publications, did not believe that Harvey had slapped and secluded the resident or had no reasonable grounds for believing the accusations were true. We recognize that the Department of Labor ultimately concluded that Harvey did not engage in gross misconduct and that the circuit court acquitted Harvey of the charges of felony elder abuse. But those legal determinations do not establish that Regional Health, Sughrue, Gisi, Smith, and Shockey did not believe and had no reasonable grounds for believing—at the time they published the accusations—that Harvey had slapped and secluded a resident. *See Dacy*, 1996 S.D. 72, ¶ 14, 550 N.W.2d at 94. As the circuit court recognized at the summary judgment hearing, Harvey conflates whether the incidents actually happened with whether the defendants believed they actually happened.

[¶33.] Even so, Harvey insists that Regional Health, Sughrue, Gisi, Smith, and Shockey acted in reckless disregard for the truth because they did not—as Harvey claims—"walk down the hallway to talk with staff and residents" and Sughrue, Gisi, Smith, and Shockey did not promptly interview staff and residents as part of a legitimate investigation. But "it is settled that proof of a reckless disregard for the truth establishing malice requires more than proof of a defendant's failure to investigate." *Peterson v. City of Mitchell*, 499 N.W.2d 911, 916 (S.D.

1993). Likewise, we do not measure the defendants' conduct "by whether a reasonably prudent man would have published, or would have investigated before publishing." *Dacy*, 1996 S.D. 72, ¶ 8, 550 N.W.2d at 93 (quoting *Janklow*, 459 N.W.2d at 419); *accord Schwaiger*, 2006 S.D. 44, ¶ 18, 714 N.W.2d at 882. Therefore, even if we accept that these defendants were unreasonable and negligent in their investigation of the accusations against Harvey, that does not create a dispute of material fact on the question whether Regional Health, Sughrue, Gisi, Smith, and Shockey entertained serious doubts as to the truth of the publications or acted in reckless disregard for the truth.

[¶34.]     The record reveals that at the time these defendants made the publications, they knew that two employees had made independent accusations against Harvey. They knew one employee had a negative work history and that issues existed between Harvey and that employee. They also knew, via Meade's report, that Meade tended to believe the accusations based on her personal observations of Harvey's increased frustration with the resident. Meade also reported that she believed Ellenbecker to be credible and noted that Ellenbecker's work history was positive. Gisi, Shockey, Smith, and Sughrue were also aware that Harvey admitted to tapping (not slapping) and to taking the resident to the resident's room. Because Harvey directs us to no evidence that Regional Health, Sughrue, Gisi, Smith, and Shockey in fact entertained serious doubts as to the truth of the publications or that they had no reasonable grounds for believing the accusations at the time of publications, the circuit court did not err when it concluded that Harvey failed to meet her burden of proof.

[¶35.]    Alternatively, Harvey claims that the court erred when it granted summary judgment because a disputed issue of material fact exists on the question whether Regional Health can be held directly liable for the conduct of Ellenbecker, Edstrom, and Meade under the doctrine of respondeat superior. Harvey claims that Ellenbecker, Edstrom, and Meade made intentionally slanderous publications at least in part to further their employer's business. She relies on the fact that state law and Regional Health policies require employees to report abuse against residents. Thus, in Harvey's view, even though Edstrom and Ellenbecker had personal motivation to slander Harvey, they did not act *purely* for personal motive.

[¶36.]    Harvey directs this Court to no authority to support her claim that Regional Health may be held directly liable for Edstrom's and Ellenbecker's slanderous communications based on the doctrine of respondeat superior. Harvey quotes the two-prong test restated in *Kirlin v. Halverson*, 2008 S.D. 107, 758 N.W.2d 436, and *Bernie v. Catholic Diocese of Sioux Falls*, 2012 S.D. 63, ¶ 9, 821 N.W.2d 232, 237. That test examines "whether the purpose of the act was to serve the principal and whether the act was foreseeable." *Bernie*, 2012 S.D. 63, ¶ 9, 821 N.W.2d at 237. Harvey notes that whether an employee's wrongful acts were within the scope of employment is a question of fact for a jury, citing *Kirlin*, 2008 S.D. 107, ¶ 16, 758 N.W.2d at 445. She then emphasizes that a jury must determine whether Edstrom's and Ellenbecker's acts were done at least in part to further Regional Health's business. In her view, because state law and Regional Health policies require employees to report abuse, Edstrom's and Ellenbecker's

reports of abuse, even though false, at least in part carried out the objective of their employment.

[¶37.] Generally whether an intentional tort is within the scope of employment is a question of fact, but there are occasions "where [an agent's] digression from duty is so clear-cut that the disposition of the case becomes a matter of law." *Bernie*, 2012 S.D. 63, ¶ 13, 821 N.W.2d at 239 (quoting *Doe v. Norwich Roman Catholic Diocesan Corp.*, 268 F. Supp. 2d 139, 142 (D. Conn. 2003)). Therefore, we must determine if Edstrom's and Ellenbecker's false reports of abuse against a nursing home resident were "wholly motivated by [their] personal interests." *Id.* ¶ 9. This is because "[i]f the agent acted with intent to serve solely his own interest, the act was not within the scope of employment and the principal is not liable." *Id.*

[¶38.] Here, we cannot say that making a false report of abuse against a coworker was part of Edstrom's or Ellenbecker's duties or within Regional Health's business. Indeed, Harvey claims that Edstrom and Ellenbecker falsely reported the abuse because they wanted to get Harvey fired. To conclude otherwise would mean that any employee's false report against another employee for wrongdoing would expose the employer to liability for slander. Because Edstrom's and Ellenbecker's false reports of abuse were solely within their own interests, we need not consider whether falsely reporting abuse was foreseeable.

[¶39.] In regard to Meade, Harvey claims that Regional Health should be held liable because Meade "solicited the accusations and reported them to the [Department of Health]"; she "selectively investigated the accusations and then

-17-

stated them as her own to" the Department and the police department; and because Regional Health admitted that Meade was acting within the scope of her employment when she investigated the allegations of abuse, terminated Harvey, and handled Harvey's termination grievance. But it is undisputed that Meade did not make the accusations against Harvey. On the contrary, Meade's actions, for which Harvey seeks to make Regional Health liable, relate not to the intentional tort of slander (because Meade did not make the accusations) but to Meade's negligent investigation of the accusations. Further, Harvey only offers the conclusory statement that Meade adopted the accusations as her own and thereafter slandered Harvey. Because Meade did not make the accusations and because a failure to investigate does not establish malice necessary to prove a reckless disregard for the truth, there is no issue of material fact in dispute on the question whether Regional Health can be held liable for Meade's acts.

[¶40.] The circuit court properly granted summary judgment against Harvey's slander claim.

### 2. *Intentional Infliction of Emotional Distress*

[¶41.] To survive Regional Health's motion for summary judgment on her claim for intentional infliction of emotional distress, Harvey must "demonstrate that there was an issue of material fact as to each of the elements" of the claim. *Fix v. First State Bank of Roscoe*, 2011 S.D. 80, ¶ 19, 807 N.W.2d 612, 618. The elements are:

> (1) an act by the defendant amounting to extreme and outrageous conduct; (2) intent on the part of the defendant to cause the plaintiff severe emotional distress; (3) the defendant's conduct was the cause in-fact of plaintiff's distress; and (4) the

> plaintiff suffered an extreme disabling emotional response to defendant's conduct.

*Anderson v. First Century Fed. Credit Union*, 2007 S.D. 65, ¶ 38, 738 N.W.2d 40, 51-52. Because Harvey's evidence viewed in a light most favorable to her does not identify extreme and outrageous conduct by Regional Health, we address only the first element.

[¶42.]     In *Harris v. Jefferson Partners, L.P.*, we explained:

> The question whether the defendant's conduct was extreme and outrageous is initially for the trial court. *Richardson v. East River Elec. Power Coop.*, 531 N.W.2d 23, 27 (S.D. 1995). Comment d to the Restatement (Second) of Torts § 46 (1965) explains that recovery is permissible only where the actor's conduct was "extreme and outrageous." Proof under this tort must exceed a rigorous benchmark. The conduct necessary to form intentional infliction of emotional distress must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* See *Stene v. State Farm Mut. Auto. Ins. Co.*, 1998 S.D. 95, ¶ 32, 583 N.W.2d 399, 404; *Tibke v. McDougall*, 479 N.W.2d 898, 906-07 (S.D. 1992). Liability for this tort will "not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities." Restatement (Second) of Torts § 46 cmt. d.

2002 S.D. 132, ¶ 11, 653 N.W.2d 496, 500.

[¶43.]     Harvey argues that "[f]alsely accusing a caregiver of slapping and secluding a disabled nursing home resident—felony elder abuse—goes far beyond insult or triviality." She relies on the fact Regional Health submitted its mandatory five-day investigative report to the Department four months late and misrepresented in that report that Regional Health had interviewed residents. She also highlights that the Department of Labor concluded that she did not engage in gross misconduct, and the circuit court held that Harvey did not commit felony elder

abuse. In Harvey's view, Regional Health violated corporate policies, state laws, and state administrative rules.

[¶44.] Although Harvey ultimately prevailed in her unemployment claim and was acquitted of felony charges, we cannot say that Regional Health's conduct surrounding Harvey's termination was "so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Tibke*, 479 N.W.2d at 907 (quoting Restatement (Second) of Torts § 46 cmt. d). We also recognize that the investigation into the accusations against Harvey before reporting to the Department of Health was at best inadequate and conclusory. In fact, the manner in which Golden Ridge handled the report of abuse violated the Department of Health's rules and resulted in an investigation by the Department into Golden Ridge's policies. It is further troubling that Meade immediately recommended termination when at least one of Harvey's accusers arguably had a motive to get Harvey fired. But on the evidence before us, we cannot say that reasonable minds could differ in finding that Regional Health's conduct was not extreme and outrageous. The court did not err when it granted Regional Health summary judgment on Harvey's IIED claim.

### 3. *Malicious Prosecution*

[¶45.] A claim for malicious prosecution requires the plaintiff to prove:

> (1) The commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant against plaintiff, who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; (6) damage conforming to legal standards resulting to plaintiff.

*Danielson v. Hess*, 2011 S.D. 82, ¶ 9, 807 N.W.2d 113, 115-16 (quoting *Heib v. Lehrkamp*, 2005 S.D. 98, ¶ 21 n.8, 704 N.W.2d 875, 884 n.8). Because Harvey has not demonstrated a material issue of fact in dispute on the question of legal causation, we address only that element.

[¶46.]     Regional Health must be "the proximate and efficient cause of maliciously putting the law in motion." *Id.* ¶ 10 (quoting *Leisinger v. Jacobson*, 2002 S.D. 108, ¶ 14, 651 N.W.2d 693, 698). If "the state's attorney or an officer of the law pushes the prosecution forward, that defendant is not liable." *Id.* Here, State's Attorney John Fitzgerald pushed the prosecution forward. Yes, the Department referred the matter for criminal investigation because Regional Health reported the alleged abuse, and the Department arguably did not have full and complete reports from Regional Health. But when Officer Fredricksen independently investigated the allegations, Regional Health provided full and complete reports. Harvey does not dispute this. In fact, Officer Fredricksen armed with a more complete picture than that given to the Department recommended that Harvey not be prosecuted. Despite the recommendation, State's Attorney Fitzgerald convened a grand jury to seek an indictment against Harvey. Because State's Attorney Fitzgerald's independent decision to present it to a grand jury and the grand jury's decision to indict legally caused Harvey's prosecution, Regional Health cannot be liable for malicious prosecution. The circuit court did not err when it granted Regional Health summary judgment on Harvey's claim for malicious prosecution.

### 4. *Punitive Damages*

[¶47.]    There exists no independent cause of action for punitive damages. Rather, to pursue her claim for punitive damages, Harvey was first required to make a preliminary showing of a reasonable basis to support that punitive damages may be proper. *Stabler v. First State Bank of Roscoe*, 2015 S.D. 44, ¶ 37, 865 N.W.2d 466, 484. This requires clear and convincing evidence that there is a reasonable basis to believe that there had been willful, wanton, or malicious conduct on the part of the defendant. *Id.* Because we previously concluded that the circuit court did not err when it summarily dismissed Harvey's intentional tort claims, the court likewise properly dismissed Harvey's request to submit a claim for punitive damages.

### 5. *Wrongful Termination*

[¶48.]    Harvey concedes that she is an at-will employee. But she argues that the whistleblower exception to the at-will doctrine applies in this case. She asserts that she was a whistleblower because she complained to her supervisors about "unsafe staff performance." According to Harvey, the whistleblower protection is broad, and this Court should recognize the public policy in protecting employees that ensure our elderly have safe care.

[¶49.]    It is well settled that "a cause of action for wrongful discharge arises on behalf of an employee where an employer's motivation for termination contravenes a clear mandate of public policy." *Dahl v. Combined Ins. Co.*, 2001 S.D. 12, ¶ 8, 621 N.W.2d 163, 166 (quoting *Niesent v. Homestake Min. Co.*, 505 N.W.2d 781, 783 (S.D. 1993)). But "[t]o state a cause of action under this exception, the

employee must plead and prove that a substantial public policy may have been violated." *Id.* ¶ 11 (quoting *Niesent*, 505 N.W.2d at 783).

[¶50.] Here, Harvey does not request this Court to adopt a new public policy exception; nor does she suggest that she complained of unlawful or criminal conduct. Rather, she requests that this Court expand the whistleblower exception beyond the language in *Dahl* to include her complaints about coworkers and a recommendation that security cameras be purchased. This we will not do. Harvey has not identified a substantial public policy that may have been violated. And to conclude otherwise would eviscerate the at-will doctrine in favor of judicial management of employee/management relations.

### 6. *Negligent Infliction of Emotional Distress*

[¶51.] In *Blaha v. Stuard*, we recognized that the first element in a claim of negligent infliction of emotional distress is that the defendant engaged in negligent conduct. 2002 S.D. 19, ¶ 19, 640 N.W.2d 85, 90. For negligence to exist, there must be a breach of a legal duty imposed by statute or common law. *Id.* Here, Harvey claims that Regional Health owed a duty to her "as they would anybody else, to investigate and have a basis for accusing her of felony elder abuse." But Regional Health did not accuse Harvey of felony elder abuse.

[¶52.] Nonetheless, Harvey also relies on SDCL 20-11-1, which provides that "[e]very person is obligated to refrain from infringing upon the right of others not to be defamed." The statements Harvey claims to be defamatory were made by Edstrom and Ellenbecker; yet Harvey did not bring suit against them. She brought suit against Regional Health, Sughrue, Gisi, Smith, and Shockey. Because we

affirmed the circuit court's decision to grant summary judgment dismissing Harvey's slander claim, and Harvey has not identified a legal duty imposed by statute or common law, the circuit court properly granted Regional Health summary judgment on Harvey's claim of negligent infliction of emotional distress.

### 7. *Breach of Contract*

[¶53.]     Harvey argues that the circuit court erred when it held that Regional Health's Fair Treatment/Grievance Procedure did not create an enforceable contract. She recognizes that Regional Health specifically reserved the right to terminate at will in the employee handbook. But she claims that Regional Health's separate Fair Treatment/Grievance Procedure policy did not use similar reserving language and therefore created a contract requiring Regional Health to investigate the decision to terminate her. Harvey then claims that Regional Health breached the contract when it failed to follow the mandates of the grievance procedure and investigate the employment decision at each step in the grievance process.

[¶54.]     In response, Regional Health argues that the grievance procedure did not change Harvey's at-will employment. It relies on this Court's holding in *Butterfield v. Citibank of S.D.*, 437 N.W.2d 857 (S.D. 1989). In that case, we recognized two possible ways language in an employee handbook could indicate that the employer surrendered the statutory power to terminate employees at will. *Id.* at 859. One way exists when the employee handbook explicitly states that discharge will occur for cause only or uses other comparable language. *Id.* Alternatively, "a 'for cause only' agreement may be implied where the handbook contains a detailed list of exclusive grounds for employee discipline or discharge

and, a mandatory and specific procedure which the employer agrees to follow prior to any employee's termination." *Id.*

[¶55.]        The existence of a contract is a question of law. *Humble v. Wyant*, 2014 S.D. 4, ¶ 40, 843 N.W.2d 334, 343. From our review, nothing in Regional Health's employee handbook explicitly surrendered its right to terminate Harvey at will. Likewise, nothing in the language of the employee handbook supports an implied agreement to terminate for cause only. The handbook contains no detailed list of exclusive grounds for employee discipline or discharge or mandatory procedure Regional Health agreed to follow prior to terminating Harvey.

[¶56.]        But Harvey distinguishes *Butterfield* because, in her view, *Butterfield* addressed only whether a *pre-termination* agreement could alter the employment relationship. She claims that this case concerns a *post-termination* agreement separate from the employee handbook and asks this Court to follow *Zavadil v. Alcoa Extrusions, Inc.*, 363 F. Supp. 2d 1187 (D.S.D. 2005), and *Meyers v. Am. States Ins. Co.*, 926 F. Supp. 904 (D.S.D. 1996). In *Zavadil*, the District Court for South Dakota concluded that the employer's peer review policy and procedures created an enforceable contract for an employee discharged at-will. 363 F. Supp. 2d at 1193. In the district court's view, the specific language of the peer review policy and the described procedures contained no disclaimers against waiving the at-will doctrine and instead gave the employees the option of using a review process to review "termination actions to ensure that a policy or practice was applied properly and consistently[.]" *Id.*; *accord Meyers*, 926 F. Supp. at 913 (reduction in staff section within manual created mandatory procedures the employer agreed to follow).

[¶57.] Regional Health's employee handbook contains a section titled, "Fair Treatment/Grievance Procedure" and identifies Regional Health's desire "that the employee work with their supervisor through an informal communication process of discussion, information gathering, and resolution with the supervisor." If, however, "an issue or complaint cannot be resolved with the supervisor after the information communication process and the concern deals with the application or interpretation of a Regional Health policy, the employee can exercise a formal grievance procedure." The employee handbook refers the employee to the Fair Treatment/Grievance Procedure policy. That policy indicates that Regional Health "provides employees with an opportunity . . . to appeal management decisions regarding the dispensing of discipline, without fear of retaliation, through a fair treatment/grievance resolution procedure." Termination of employment is an appropriate complaint/grievance under the policy. "The grievance procedure is considered an internal affair." The policy then directs the employee to utilize a four-step process. Each step of the process identifies the persons tasked with reviewing or investigating the complaint and the steps the employee can take upon dissatisfaction at any given level. The fourth level denotes the final decision of the employer.

[¶58.] Although the language of the grievance policy gives Harvey the right to appeal Regional Health's decision to terminate her, it does not restrict Regional Health from terminating her for no cause and without notice. Also, unlike the policy examined in *Zavadil*, the grievance policy here does not mandate that Regional Health review termination actions to ensure its policies and procedures

were applied properly and consistently. Rather, the Fair Treatment/Grievance Procedure policy creates self-imposed policies to address a broad range of matters related to employee dissatisfaction when management interprets or applies a work-related policy.

[¶59.] We also note that the Fair Treatment/Grievance Procedure policy is part of the employee handbook. The employee handbook incorporates it and provides that Regional Health's publications "are not to be regarded as a promise to provide specific terms and conditions of employment." Regional Health repeatedly and explicitly reserved its right to terminate at will in its handbook. It informed employees that "Regional Health does not guarantee continued employment to employees and reserves the right to terminate or lay off employees for any lawful reason with or without notice." In regard to corrective action and discipline, the handbook informs employees that Regional Health "can skip steps and terminate an employee even if no previous warning was provided" and that it "reserves the absolute right to determine what action or conduct will result in discipline, and what level of discipline will be assessed[.]" From our review of the grievance procedure in relation to the employee handbook, we conclude that Regional Health did not intend to bind itself to a different employment relationship and surrender its statutory right to terminate Harvey at will. The circuit court did not err when it granted Regional Health summary judgment on Harvey's breach of contract claim.

## Conclusion

[¶60.] Because the circuit court did not err when it granted Regional Health summary judgment and dismissed Harvey's claims, we affirm.

[¶61.]    GILBERTSON, Chief Justice, and ZINTER and JENSEN, Justices,

concur.

[¶62.]    KERN, Justice, deeming herself disqualified, did not participate.